**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| WILLIE WILLIAMS<br>6006 Rock Cliff Lane<br>Alexandria, Virginia 22315<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>NAVY-MARINE CORPS RELIEF<br>　SOCIETY<br>875 N. Randolph Street<br>Arlington, Virginia 22203<br><br>Serve:　Registered Agents Inc.<br>　　　　8401 Maryland Drive, Suite S<br>　　　　Richmond, VA 23294<br><br>　　　Defendant. | Civil Action No. 1:25-cv-01766-PTG-LRV |

## AMENDED COMPLAINT

Plaintiff Willie Williams ("Mr. Williams" or "Plaintiff"), by counsel, files this Amended Complaint against Defendant Navy–Marine Corps Relief Society ("NMCRS", "the Society" or "Defendant") and alleges as follows:

## NATURE OF ACTION

1.　　For nearly twenty-five years, Plaintiff Willie Williams served the Navy-Marine Corps Relief Society. As NMCRS's first and only Black executive officer, he led its global IT enterprise and supported millions of Sailors, Marines, and their families.

2.　　On May 23, 2023, NMCRS terminated Mr. Williams—(nineteen days) after he suffered a heart attack on May 4, 2023 and (one day) after he formally requested FMLA leave and disability accommodations for cardiac rehabilitation on May 22, 2023. The termination

caused immediate physical harm: Mr. Williams collapsed during his fourth cardiac rehabilitation session on May 24, 2023 (the day after termination), lost consciousness, and required emergency medical intervention and hospitalization, initiating an eighteen-month medical crisis that prevented him from immediately asserting his legal rights.

3.      The termination was the culmination of a multi-year pattern of race discrimination, a racially hostile work environment, and retaliation—including a pretextual Performance Improvement Plan ("PIP") and surreptitious recruitment for his replacement while he was still employed.

4.      This civil action asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981; the Americans with Disabilities Act (Title I), 42 U.S.C. § 12101 et seq.; the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.; and the Virginia Human Rights Act, Va. Code § 2.2-3900 et seq. Plaintiff seeks back pay; front pay or reinstatement; compensatory and punitive damages; FMLA liquidated damages; attorneys' fees and costs; and pre- and post-judgment interest.

## **PARTIES**

5.      Plaintiff Willie Williams is an individual and former employee of Defendant. Mr. Williams resides in, and is a citizen of, the Commonwealth of Virginia, and at all relevant times has resided within this judicial district.

6.      Defendant Navy-Marine Corps Relief Society is a District of Columbia nonprofit corporation registered to do business in Virginia, and it maintains its principal office and headquarters at 875 N. Randolph Street, Arlington, Virginia 22203, within the Eastern District of Virginia, Alexandria Division.

7.      At all relevant times, Mr. Williams was employed by NMCRS in Arlington, Virginia, serving as Vice President and Chief Information Officer ("CIO"). He was the organization's first and only Black executive officer in its more than 100-year history.

8.      NMCRS is an "employer" under Title VII, 42 U.S.C. § 2000e(b); the ADA, 42 U.S.C. § 12111(5); and the FMLA, 29 U.S.C. § 2611(4)(A)(i), employing at least fifteen employees (and at least fifty employees for FMLA purposes) for the requisite periods. Mr. Williams was an "eligible employee" under the FMLA, 29 U.S.C. § 2611(2)(A), having been employed for more than twelve months and having worked at least 1,250 hours in the twelve months preceding his FMLA request. At all relevant times, NMCRS employed more than 150 employees, making it subject to the enhanced damages provisions under 42 U.S.C. § 1981a(b)(3)(D).

## JURISDICTION AND VENUE

9.      This Court has federal-question jurisdiction under 28 U.S.C. § 1331, and jurisdiction under 28 U.S.C. § 1343(a)(4) for claims arising under 42 U.S.C. § 1981.

10.     The Court has supplemental jurisdiction over related Virginia law claims under 28 U.S.C. § 1367(a).

11.     Defendant NMCRS is subject to personal jurisdiction in Virginia because its headquarters are located in Arlington, Virginia, and the claims arise from conduct in Virginia.

12.     Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b)(1)–(2). NMCRS "resides" in this District within the meaning of § 1391(c)(2) because it maintains its principal place of business and headquarters in Arlington, Virginia, and a substantial part of the events or omissions giving rise to the claims occurred there. Venue is also proper under 42 U.S.C. § 2000e-5(f)(3).

13.     Assignment to the Alexandria Division is proper because Arlington County lies within this Division. *See* E.D. Va. Local Civ. R. 3; 28 U.S.C. § 127(b).

## PROCEDURAL STATUS

14.     On March 18, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (Charge No. 12K-2025-00177), which was dual-filed with the Virginia Office of Civil Rights.

15.     On May 19, 2025, the Virginia Office of Civil Rights issued a Notice of Right to File. To preserve those claims, on August 18, 2025, Plaintiff filed a Virginia Human Rights Act complaint in the Arlington County Circuit Court (Case No. CL25-3714). The state court action has been stayed pending resolution of this federal action.

16.     The EEOC issued a Notice of Right to Sue dated June 18, 2025. Plaintiff first received notice on July 17, 2025, due to issues with the EEOC portal.

17.     The EEOC State, Local, and Tribal Coordinator confirmed in writing that July 17, 2025 is the operative receipt date for calculating the ninety-day federal filing period.

18.     This action is timely because it was filed within ninety (90) days of Plaintiff's July 17, 2025 receipt of the EEOC Notice of Right to Sue; the ninety-day period expires on October 15, 2025. In the alternative, equitable tolling applies due to the EEOC portal malfunction and Plaintiff's reasonable reliance on the delayed receipt date confirmed in writing by the EEOC State, Local, and Tribal Coordinator

     (a)  Additionally, equitable tolling applies due to Mr. Williams's medical incapacity. NMCRS strategically terminated Mr. Williams on May 23, 2023—just nineteen days after his May 4, 2023 cardiac event requiring hospitalization—during his acute recovery period when he was most medically vulnerable. The termination

4

caused immediate physical harm: Mr. Williams collapsed during his cardiac rehabilitation session on May 24, 2023 (the day after termination), lost consciousness, and required emergency medical intervention. This event forced discontinuation of his physician-directed cardiac rehabilitation and initiated an eighteen-month medical crisis during which Mr. Williams was physically and mentally unable to pursue legal remedies. Mr. Williams could not resume cardiac rehabilitation until May 7, 2024 (one year later) and did not complete the medically necessary program until October 9, 2024. Throughout this period, Mr. Williams was forced to prioritize his physical survival over legal action while managing ongoing cardiac symptoms, extreme fatigue, and loss of employer-provided health insurance during the medical crisis. Upon information and belief, NMCRS deliberately timed Mr. Williams's termination to exploit his medical vulnerability and prevent him from timely asserting his legal rights. The timing was not coincidental: NMCRS terminated Mr. Williams when he was least able to defend himself, knowing the termination would interrupt critical medical treatment and compound his medical crisis.

19.    Plaintiff has exhausted the administrative prerequisites for his Title VII and ADA claims. Claims under 42 U.S.C. § 1981 and the FMLA do not require administrative exhaustion.

20.    Racially hostile and retaliatory conduct occurring before May 24, 2022 (300 days before the March 18, 2024 EEOC charge) is part of the same unlawful employment practice that culminated in Plaintiff's May 23, 2023 termination and continued through post-termination retaliation in 2023, 2024, and 2025, and is therefore timely under the continuing violation doctrine.

## FACTUAL ALLEGATIONS

**A.  Mr. Williams Dedicates 25 Years to NMCRS, Becoming Its First and Only Black Executive Officer**

21.     Mr. Williams is Black (African American) and a member of protected classes under federal and Virginia law.

22.     NMCRS is a private, non-profit District of Columbia corporation headquartered in Arlington, Virginia. The Society provides financial, educational, and other assistance to members of the naval services and their families.

23.     NMCRS operates with federal recognition and support under Title 10 of the United States Code. Upon information and belief, NMCRS receives federal financial and in-kind support, including facility support for its Arlington, Virginia headquarters, provided through the Navy's Commander, Navy Installations Command ("CNIC").

24.     Mr. Williams began working for NMCRS in June 1998 and served the organization for nearly twenty-five years. He rose progressively through the ranks: Network Analyst (1998-2000), Chief Architect (2001-2003), Director of Information Technology (2003-2005), and in 2006, Vice President and Chief Information Officer ("CIO").

25.     Mr. Williams became the first and only Black executive officer in the organization's 119-year history. His 2006 promotion was so significant that NMCRS amended its bylaws to permit it. The bylaws at the time generally restricted officer roles to retired military officers. This change was championed by CEO Steven Abbot and the Board of Directors, led by former Chairman of the Joint Chiefs of Staff Admiral Michael Mullen, in recognition of Mr. Williams's "extraordinary leadership and compassion." When Mr. Williams was promoted to Vice President and Chief Information Officer in 2006, no distinction was made regarding military service requirements; Mr. Williams was told by the President and other officers that he

was their equal and that seniority determined succession. For fourteen years (2006-2020), no officer or board member raised any issue with Mr. Williams's eligibility for the line of succession. In fact, between 2019 and 2021, the Board of Directors considered hiring a civilian as President, demonstrating that military service was not considered essential for executive leadership at NMCRS.

26.    In January 2018, Mr. Williams suffered a heart attack requiring emergency quadruple bypass surgery. The extreme workplace stress stemming from the hostile environment and racial animus he faced directly contributed to this heart attack. He successfully recovered, returned to work, and continued to lead NMCRS's global IT operations with distinction.

27.    As Vice President and Chief Information Officer, Mr. Williams built NMCRS's modern IT ecosystem from the ground up. He designed and implemented the Society's first global Wide Area Network ("WAN") and VPN architecture, connecting all worldwide sites for the first time. He led global IT operations across 235 offices worldwide, directed enterprise cybersecurity and risk management, oversaw full system lifecycles for mission-critical platforms, and maintained 99.9% network uptime. He led multiple organization-wide technology transformations, including:

(a) Mr. Williams maintained rigorous oversight of IT operations through formal project management methodologies and regular status reporting. In October 2021—the same month he received praise from both Field Director Whitmire and Advisory Council member Admiral White—Mr. Williams's formal IT Project Status Report documented exceptional performance across the IT portfolio. Of 14 major IT projects and initiatives being tracked, 12 projects (86%) received "Green" status ratings across all performance categories (Schedule, Budget,

Resourcing, and Risk/Issue), with only one project showing a minor amber status due to an external vendor staffing change, and zero projects rated as "at risk" or requiring intervention. The report demonstrated that major initiatives including FSO CAP II deployment, Cloud Infrastructure (Azure), Compliance and Security Infrastructure, Microsoft O365 (including Teams), Digital Signatures, Digital Disbursements, and NIST Security Controls were all on schedule, on budget, properly resourced, and proceeding as planned. Budget utilization was on track with the approved business plan. This contemporaneous objective documentation of exceptional IT performance—conducted using professional project management standards with multi-dimensional status tracking—directly contradicts NMCRS's subsequent manufactured narrative of IT performance deficiencies.

(b) The worldwide deployment of the CAP II Casework Management System to all 52 full-service offices by May 2022, enabling the Society to distribute approximately $50 million in assistance to service members and their families annually;

(c) The organization-wide migration to Microsoft 365, a complex, worldwide rollout completed on schedule;

(d) The development and ongoing maintenance of the Nightingale Solution, the patient care system for the Visiting Nurse Program handling Protected Health Information ("PHI") for military families worldwide;

(e) In December 2022, the deployment of a major Nightingale system upgrade incorporating critical HIPAA compliance features and enhanced patient data

protections, an action Mr. Williams characterized as "real-time boot-on-the-ground" decision-making to fulfill his fiduciary duty after five months of delay by other officers; and

(f) The successful launch of the modernized Scholarship Management Application in early 2023, which digitized the manual scholarship process and immediately processed over 500 electronic applications.

28.    Mr. Williams's performance was consistently exceptional. He solved a persistent financial deficiency by designing and implementing systems that ensured the casework management system reconciled with the ERP, resulting in the Society's first-ever clean financial audit. He maintained this record of clean financial audits for over 15 years. He maintained 99.9% network uptime across global sites and stewarded major cybersecurity implementations that kept NMCRS compliant with NIST, PCI, and HIPAA standards. His team secured and maintained the necessary Department of Defense Certification and Accreditation to operate on secure DOD networks, critical for the Society's cash flow.

29.    Mr. Williams's leadership earned recognition from both internal stakeholders and external national security experts, including senior Navy and Marine Corps officials serving on the Joint Chiefs of Staff.

30.    In early October 2021, Field Director Bill Whitmire, who had 30 years of experience working with IT organizations, praised Mr. Williams's IT team, stating it was "the FIRST IT organization I've seen in my 30 year career where the IT guys are not only experts how to set up and manage the network, but actually know how to use and help with all the approved apps that are on it," and noting "Y'all never cease to amaze me how you do what you

do with so few humans!" CEO Jack Klimp endorsed this assessment, responding "Good stuff. Nice to be appreciated."

31.    Just days later, on or about October 15, 2021, Advisory Council member Admiral T.J. White, an external national security and cyber operations expert, commended NMCRS's cybersecurity posture, stating he was "particularly pleased by the IT section" of the board letter and that Mr. Williams and his team were "doing exactly what is needed." CEO Jack Klimp endorsed this assessment, asking Mr. Williams to pass along a "well deserved 'Atta-boy and Atta-girl'" to his team from both of them.

32.    The major CAP II deployment—one of the most critical IT initiatives in the Society's history—continued to succeed through early 2022. In April 2022, a Field Director thanked Mr. Williams and his IT team for a "successful transition over to CAP II," noting they "felt well prepared and were able to assist clients seamlessly" with "little to no delay." The Director specifically thanked "Michael, Melodie, Willie, Ann, Susan, Kelly, Brian, Jodi" for their personal training and support. CEO Jack Klimp responded "Super. One more step forward," and COO Dawn Cutler—who would make the racially charged "crack the whip" remark just five weeks later—responded enthusiastically "Woot Woot!!!!"

33.    Even the incoming CEO, Robert Ruark, publicly praised Mr. Williams in his retirement announcement, calling him a "standard-bearer" who left an "indelible mark of commitment and accomplishments."

**B.  Pattern of Racial Targeting, Exclusion, Retaliation, and Hostility**

34.    As the first and only Black executive officer in NMCRS's 119-year history, Mr. Williams was consistently subjected to exclusionary and discriminatory conduct by white officers. Beginning no later than 2017 and continuing through his 2023 termination, he was

systematically excluded from key meetings, stripped of longstanding executive authorities, bypassed on strategic decisions, and subjected to racially charged remarks, targeting, and retaliation.

**Protected Activity and Immediate Retaliation (2019-2020)**

35.    Chief Operating Officer Pete Collins, a white officer who served as CAO from 2012 to 2017 and COO from 2017 to February 2020, was identified as a primary architect of the hostile environment. As documented in the 2018 Culture & Human Resources Assessment and corroborated by multiple witnesses, Collins made derogatory comments with racial overtones, including explicitly referring to Mr. Williams's IT department as being run by "a black, an Asian, and a Jew," thereby targeting Mr. Williams (Black), IT Director Jodi Briggs (Asian female), and Network Engineer Michael Yampolsky (Jewish male). Collins routinely made comments that were derogatory, racist, intimidating, and demeaning to staff, both at Headquarters and during visits to field offices.

36.    In or around December 2017, while CEO Steven Abbot was out of the office on bereavement leave, COO Collins directed Chief Administrative Officer Kathy Estes to investigate Mr. Williams for alleged financial impropriety. CAO Estes conducted a preliminary investigation and found no evidence of fraud or financial impropriety by Mr. Williams.

37.    By January 2018, all executive officers, including COO Collins and CFO Bill Zamagni, met with CEO Abbot and agreed that all alleged "concerns" about Mr. Williams had been "rectified and addressed," and they affirmed to the CEO that they had "no further issues." Former CEO Abbot formally documented that the investigation found "no indication of fraud or malfeasance on his part."

11

38.     On July 17, 2019, Mr. Williams engaged in legally protected activity by co-authoring and leading a formal written complaint to the NMCRS Board of Directors, addressed to Chairman Admiral John M. Richardson. The letter detailed a "Loss in Confidence, and Toxic Work Environment" and explicitly cited "derogatory and arguably racist comments and off-color jokes" made by NMCRS leadership, particularly Collins. The letter noted that staff members were reluctant to speak up due to fear of retribution.

39.     Following his July 17, 2019 Board complaint, white officers, including Collins and CFO Bill Zamagni, engaged in a coordinated campaign to discredit Mr. Williams by poisoning the well with the incoming CEO, Jack Klimp, who arrived in October 2019 by falsely claiming Mr. Williams lacked accountability.

40.     When CEO Jack Klimp arrived in October 2019, he explicitly acknowledged that there was "a lot of drama and animosity among the officers...mostly focused toward our CIO, Willie Williams," and that the previous hostility had resulted in a "toxic work environment." Despite this admission, Mr. Klimp adopted the hostile narrative against Mr. Williams, acknowledged Mr. Williams was a "target," but blamed him for the conflict, stating he needed Mr. Williams's help to stop the drama. Klimp subsequently avoided speaking with Mr. Williams for several months.

41.     In February 2020, CEO Klimp shared with Mr. Williams correspondence from NMCRS's outside counsel, Wilson Elser, related to litigation filed by Mr. Collins.

42.     In an April 15, 2020 letter from Wilson Elser to Mr. Collins's counsel, NMCRS's counsel stated that COO Collins's investigation appeared to be a "witch hunt" targeting "one of his colleagues (who happens to be a Black male)"—referring to Mr. Williams—and confirmed that NMCRS's internal investigation "did not find any fraud or financial impropriety by CIO

12

Williams." Wilson Elser characterized COO Collins's continued allegations as "troubling" and "continued harassment of the CIO." The April 15, 2020 letter further documented that all issues raised by COO Collins had been "rectified and addressed" by January 2018, and that all executive officers, including COO Collins, had "agreed during the executive officers' meeting in January 2018, that all of the 'concerns' about the CIO had been rectified and addressed."

43.     Despite NMCRS's own counsel confirming in April 2020 that: (1) COO Collins's investigation was a racially motivated "witch hunt" that "failed"; (2) no impropriety by Mr. Williams existed; and (3) all matters had been resolved in January 2018, NMCRS leadership nevertheless continued to target Mr. Williams—the only Black executive officer—for removal through the August 2022 PIP and May 2023 termination.

**The "Gaudio Report** Found **A Hostile Work Environment (2020)**

44.     In 2020, following Mr. Williams's July 2019 Board complaint, CEO Klimp initiated a Command Climate Review (the "Gaudio Report") led by former COO Jan Gaudio and former Director Ruthi Moore. The Gaudio Report explicitly corroborated the existence of a toxic and hostile work environment at headquarters, with staff describing the atmosphere as toxic, poor, and stressful.

45.     Upon information and belief based on briefings provided to the officer team and confirmed by witnesses Jan Gaudio and Ruthi Moore who conducted the investigation, the Gaudio Report detailed a "deliberate effort" by white officers—specifically Pete Collins, Bill Zamagni, Kathy Estes, and Shelley Marshall—to "undermine the authority of IT and particularly the CIO" and to conspire to "eliminate Williams and outsource the IT Department." A senior executive internally corroborated that the "toxic environment was instigated and fostered by

several of the Society's officers" who collaborated to "try to force some employees (especially in IT) to quit."

46.    Demonstrating the continuing exclusion and hostile treatment, the full Gaudio Report was shared with all other white officers—including COO Dawn Cutler, CAO Chris Dour, CDCO Gillian Gonzalez, and CFO Carolyn Bauer—but was deliberately withheld from Mr. Williams, the only Black officer and the primary subject of the investigation. CEO Klimp provided only a brief summary letter to Mr. Williams during officer meetings, while white officers received the complete report. This exclusion from a report investigating discrimination against him further demonstrates the systematic marginalization of Mr. Williams by white leadership.

**Systematic Disempowerment and Exclusion (2020)**

47.    In January 2020—approximately six months after his July 17, 2019 Board complaint—NMCRS removed Mr. Williams, and only Mr. Williams, from the "Authority to Act as Society Officer" signature authorization list, a financial authority he had held since his 2006 promotion to officer. All similarly situated white officers, including those with less tenure, retained their signature authority. This unilateral and selective removal diminished his executive standing and treated him differently than every other officer in the organization. CFO Bill Zamagni leveraged this removal to continuously demean Mr. Williams by loudly stating he was not authorized to sign contracts, so that everyone outside his office could hear.

48.    In May 2020—one month after NMCRS's own counsel documented the racist "witch hunt" against Mr. Williams—NMCRS excluded Mr. Williams from a large number of meetings concerning the contemplated hard freeze of the Society's defined-benefit pension plan,

despite his being the only officer actively participating in the plan and the only officer who

would be directly affected by the freeze, while including white officers with far less tenure.

49.     Mr. Williams formally protested his exclusion in a written complaint to CEO

Klimp on May 12, 2020, stating he was disappointed he was "not included or given the

opportunity to provide my inputs to the staff recommendation" when it was evident other officers

had been involved.

50.     When Mr. Williams was finally allowed to participate in pension discussions, he

spoke out forcefully against the proposed hard freeze, advocating not for himself but for

dedicated, long-serving employees who depended on the pension plan as a significant portion of

their retirement income. He argued that hard freezes "hit older, longer-tenured workers the

hardest" because they have less time to make up lost benefits through a 401(k) plan, and that

long-term employees in their 40s and 50s could end up with "much less money than expected,"

leading to a "precarious, if not death sentence position" for employees relying on the plan. He

criticized the Society's presentation because it focused on organizational savings but failed to

mention the long-term effect on employees or their morale, noting that "The whole human

element was missing." He pointed out that forcing employees into a Defined Contribution plan

during stock market volatility and COVID-19 implications put their "entire retirement account at

risk" and advocated for consulting an independent retirement plan advisory firm to explore

alternative options that had "not been explored."

51.     In direct response to his advocacy for plan participants, CEO Klimp stated to Mr.

Williams during and after a conference call that he was chastising him for "not being a team

player" and treating his opposition as adversarial rather than viewing him as a C-level peer

providing good-faith executive input. CEO Klimp and other officers then explicitly silenced him,

forbidding him from speaking on the pension topic at any upcoming Board, Finance Committee, or Executive Committee meetings. In December 2020, during a Board of Directors meeting, the CEO ordered Mr. Williams to remain silent on the subject. Mr. Williams's good-faith recommendation in May 2020 to consult an independent retirement plan advisory firm (John Lowell of October Three) for an unbiased analysis was immediately rejected by leadership, who chose to work only with vendors they could influence to justify their predetermined goal.

52.    Behind-the-scenes coordination revealed the discriminatory nature of the silencing. An email exchange in December 2020 between CAO Chris Dour and the pension actuary showed a coordinated effort to manage Mr. Williams's opposition as an adversary, with Dour informing the actuary that Mr. Williams was "an officer that happens to be in the pension" and was "not a member of the excom and not voting," demonstrating they were actively conspiring with an outside vendor to marginalize him. A former CFO, Bill Zamagni, had explicitly told Mr. Williams he would ensure the pension plan was "not around for him to collect," revealing economic targeting. In stark contrast to the officers' hostile reaction, employees widely praised Mr. Williams's advocacy, calling him a "true advocate amongst the officers," thanking him for "being the voice of so many," and noting it was "nice to have one of the officers on the side of the pensioners."

53.    Employees across the organization recognized Mr. Williams as their advocate and thanked him for speaking on their behalf. Following the May 28, 2020 pension presentation where Mr. Williams opposed the freeze, employees sent numerous messages of gratitude, with a 22-year employee stating "thanks for being the voice of so many," a Field Director stating "You are our voice" and urging him to "be invited to the board meeting" to represent employees, and another employee noting "It is nice to have one of the officers on the side of the pensioners."

Thelisha Woods, the Black female Director of Communications who would later be terminated in the November 2024 Reduction in Force, thanked Mr. Williams for his advocacy and noted that leadership acted "almost like they aren't thinking about the people who have been here as loyal employees." Despite this widespread employee support for Mr. Williams's good-faith advocacy on behalf of long-serving employees who would be harmed by the pension freeze, CEO Klimp and other white officers responded by silencing him, forbidding him from speaking at Board meetings, and treating his opposition as insubordination rather than legitimate executive input.

54.    In June and July 2020, CEO Klimp stripped Mr. Williams of his 15-year authority to set salaries and hiring terms for IT personnel, a core executive responsibility. This adverse action was a direct retaliatory response to Mr. Williams's protected complaint on July 19, 2020, where he formally protested an unethical and unprofessional practice by which HR and the CAO unilaterally imposed a two-year salary freeze on a new IT director, Girish Pillai, which he characterized as "morally and ethically repugnant." CEO Klimp responded by telling Mr. Williams that discussing salary was "not the role of a VP to offer a salary" and that he was "out of [his] lane." No other white officer experienced comparable interference or disparate scrutiny in hiring for their departments.

55.    In September 2020, white officers circulated an internal draft memo among themselves titled "SOFT APPROACH... TIME TO MOVE ON," which explicitly outlined a premeditated plan to "force" Mr. Williams's resignation. Critically, the internal draft explicitly instructed the CEO, "(this is not the time to discuss any of his performance issues)," proving that the decision to remove Mr. Williams was predetermined and not based on performance. This document shows the subsequent performance narrative was manufactured pretext.

**Structural Discrimination: The Bylaw Amendment Battle (October 2020)**

56.     In October 2020, white officers attempted to amend NMCRS bylaws to remove Mr. Williams from the line of succession for acting CEO by introducing an arbitrary requirement that the acting officer be a "retired member of the Naval Service or spouse." This requirement was explicitly designed to disqualify Mr. Williams, the only Black officer and the only officer without military affiliation, despite his nearly 20 years of service at that time. The existing rule was based on "longest-serving Vice President," which would have made Mr. Williams next in line. The sudden introduction of a military service requirement in October 2020—after Mr. Williams had served as an officer for fourteen years and after he had filed formal complaints about discrimination—was transparently designed to uniquely disqualify him. The proposed change would have conveniently promoted several junior white officers over him.

57.     Mr. Williams was not involved in the planning process for these changes and only saw the proposal when the memorandum was released. On October 5, 2020, Mr. Williams formally objected in writing, stating he was "deeply disturbed by and strongly oppose[d] the language" and explicitly identifying it as "bias and discrimination against a CIO" and a "gratuitous insult." All other white officers on the email chain remained silent during the proposal phase, demonstrating that the discriminatory culture was pervasive and accepted by the entire white leadership team.

58.     The discriminatory bylaw proposal was ultimately rejected by senior board members, including Vice Admiral John B. Nowell, Jr., and Admiral Chris Weaver. VADM Nowell—to whom Mr. Williams had sent his formal July 2019 complaint about the toxic work environment—recommended striking the exclusionary phrase because it was unnecessary and exclusionary. Admiral Weaver concurred with this recommendation. The rejection of language

18

that would have uniquely disqualified Mr. Williams based on non-military status, combined with VADM Nowell's characterization of the language as "exclusionary," demonstrated recognition that the proposal was discriminatory in nature.

59.     The formal rejection of the bylaw change was immediately met with enraged hostility and palpable disappointment from the white officers. Upon information and belief based on reports from Executive Assistant Josie Militello, COO Dawn Cutler reacted with visible anger when the bylaw amendment was rejected, storming out of her office and later demanding to know why the CEO had not forced the change through. The collective disappointment of the other white officers demonstrated their discriminatory intent, and the failure of this discriminatory move fueled their subsequent retaliatory actions against Mr. Williams. The rejection was viewed by the hostile white officers not as a necessary correction of discriminatory policy, but as a major setback to their coordinated effort to disenfranchise and remove the only Black officer from organizational succession.

**The "Invisible Black Officer" Incidents (2020-2021)**

60.     The systematic exclusion and marginalization of Mr. Williams extended to routine officer meetings where CEO Klimp would publicly acknowledge and praise each officer individually—except Mr. Williams. On two separate occasions during officer meetings in or around 2020-2021, CEO Klimp stated words to the effect of "I have a good team that I'm so proud of," and then proceeded to go around the conference table, looking directly at each officer, calling them by name, and expressing pride in them individually. During both meetings, CEO Klimp deliberately looked at and named each white officer in sequence—COO Dawn Cutler, CAO Chris Dour, CFO Carolyn Bauer, and CDCO Gillian Gonzalez—but conspicuously

skipped over Mr. Williams, the only Black officer, as if he were invisible, never acknowledging his presence or calling his name despite Mr. Williams sitting at the table with the other officers.

61.     After the first incident, Mr. Williams was in such disbelief that he asked Josie Militello, the Executive Assistant who was present during the meeting, "Did that just happen?" Ms. Militello confirmed that it had indeed occurred and recommended that Mr. Williams speak with CEO Klimp. Mr. Williams initially attributed it to a possible memory lapse and let it go. However, when CEO Klimp repeated the exact same exclusionary conduct during a second officer meeting—again naming and praising each white officer individually while skipping over Mr. Williams entirely—it became clear this was deliberate racial exclusion, not an oversight. What made this exclusion particularly egregious was that the other white officers present at both meetings remained silent and did not correct the CEO or remind him that he had forgotten Mr. Williams, despite Mr. Williams having observed these same white officers speak up on other occasions when the CEO had inadvertently skipped calling on one of them during staff meetings.

62.     Following the second incident, Mr. Williams confronted CEO Klimp about the repeated exclusion, telling him "this was the second time he did that" and stating he was "very disturbed" by the conduct. Mr. Williams specifically noted that none of the other white officers spoke up to correct the CEO when he skipped over the only Black officer, even though they had done so when white officers were inadvertently overlooked on other occasions. He asked CEO Klimp to explain how he thought such treatment made Mr. Williams feel. Rather than apologizing or acknowledging the offensive conduct, CEO Klimp became defensive and dismissive, stating "Oh Willie, you've been here a long time, I was referring to just the new people." When Mr. Williams responded, "Sir, but you said 'team,'" CEO Klimp became disgruntled and displayed the same hostile demeanor he would later exhibit during the August

2022 PIP meeting when Mr. Williams questioned the process. This public, repeated exclusion of the only Black officer from team recognition—while naming and praising each white officer individually—demonstrated the dehumanizing nature of the racial hostility Mr. Williams faced and the complicity of white officers who witnessed the discrimination but remained silent.

**The Deputy Requirement Campaign (2013-2023)**

63.    Beginning in 2013 and persisting through his termination, Mr. Williams was uniquely and persistently required to install and maintain an IT Deputy or Deputy CIO—a requirement explicitly repeated in 2017, 2020, and 2022-2023. No other executive department led by white officers—including the CFO, COO, CDCO, or CAO—was subjected to a similar, persistent mandate to designate a deputy. This unique requirement was used as a tool to undermine Mr. Williams's managerial authority and position a potential replacement, part of the coordinated campaign to marginalize and ultimately remove the organization's only Black executive officer.

64.    Mr. Williams had already designated and approved his choice for deputy: Jodi Briggs, the IT Director, an Asian female. In November 2017, Mr. Williams officially confirmed via email to senior leadership, including CAO Kathy Estes, CEO Steve Abbot, and COO Pete Collins, that Ms. Briggs had accepted the deputy responsibilities and would act on his behalf during his absences. When Mr. Williams was out recovering from emergency quadruple bypass heart surgery from 2018 to 2019, Ms. Briggs successfully functioned as Acting CIO for approximately 18 months. CEO Steve Abbot noted that she did a "superb job" and could do it again if required. Despite this official designation, proven competence, and successful 18-month performance as Acting CIO, NMCRS leadership subsequently refused to properly document Ms.

Briggs's promotion in her personnel file, undermining both her authority and Mr. Williams's executive decision-making.

65.     In late 2017, white officers, including COO Pete Collins and CAO Kathy Estes, led a campaign to bypass Mr. Williams and appoint a white male software developer, Randy Luce, as the IT Deputy without Mr. Williams's consent or knowledge. In a November 1, 2017 email, CAO Estes framed the deputy issue in explicitly racial and gendered terms to CEO Steve Abbot, stating: "The optics are not good. We have an older, white male whose black boss allegedly promised him a position... and then gave the responsibility to an Asian female." This statement reveals the discriminatory animus underlying the campaign—white officers were uncomfortable with a Black executive officer making personnel decisions that did not favor white male employees. Estes and Collins attempted to force Mr. Williams to promote Luce based on a false narrative that Williams had promised Luce the role. Mr. Williams refused, correctly stating that Jodi Briggs was already his designated deputy. The pretextual narrative was exposed when Randy Luce himself admitted that Mr. Williams had never promised him the deputy position.

66.     The requirement for Mr. Williams to hire a different deputy, disregarding his existing designation of the proven and successful Ms. Briggs, persisted across multiple leadership changes. In August 2022, CEO Jack Klimp placed Mr. Williams on a fraudulent Performance Improvement Plan and explicitly mandated hiring an "IT deputy director" to assist with administrative responsibilities and act on his behalf during absences.

67.     In April 2022, just months before CEO Klimp placed Mr. Williams on a Performance Improvement Plan, a Field Director thanked Mr. Williams and his IT team for a "successful transition over to CAP II," noting they "felt well prepared and were able to assist

22

clients seamlessly" with "little to no delay." The Director specifically thanked "Michael, Melodie, Willie, Ann, Susan, Kelly, Brian, Jodi" for their personal training and support. CEO Jack Klimp responded "Super. One more step forward," and COO Dawn Cutler—who would make the racially charged "crack the whip" remark just five weeks later—responded enthusiastically "Woot Woot!!!!" This April 2022 praise for the successful CAP II deployment, combined with the October 2021 project status report showing 86% of projects green, makes CEO Klimp's sudden August 2022 claim of "continuing concerns" about Mr. Williams's leadership facially absurd.

68.    When Mr. Williams reminded CEO Klimp that Jodi Briggs was already the deputy who had successfully acted on his behalf for over a year, Klimp flatly dismissed her service, stating, "Well, Jody doesn't act on your behalf when you're gone," and insisted they would proceed to hire a new deputy. This move was a deliberate attempt to displace his designated minority deputy and further erode his authority.

69.    After Klimp retired, incoming CEO Robert Ruark continued this mandate in December 2022, formally outlining the expectation to "Round out your staff," including filling the "Deputy CIO" role, stating it was "needed in the event you are absent." Ruark reiterated this demand in February 2023, finding the lack of a Deputy CIO "frustrating" and demanding immediate hiring action, despite Ms. Briggs having proven her capability. This persistent refusal to recognize Ms. Briggs—an Asian female who had successfully served as Acting CIO—and the insistence on hiring a different deputy demonstrates both the targeting of Mr. Williams and associational discrimination against the minority employees he promoted."

70.    Despite NMCRS's own counsel confirming in April 2020 that: (1) COO Collins's investigation was a racially motivated "witch hunt" that "failed"; (2) no impropriety by Mr.

Williams existed; and (3) all matters had been resolved in January 2018, NMCRS leadership

nevertheless continued to target Mr. Williams—the only Black executive officer—for removal

through the August 2022 PIP and May 2023 termination.

**Continuing Exclusion and Insubordination (2021-2022)**

71.     Throughout 2021 and 2022, Mr. Williams was systematically excluded from key

meetings and strategic decisions, bypassed on critical initiatives, and routinely undermined by

white officers who directed his staff behind his back. For example, despite the "Tiger Team"

initiative focusing heavily on technology and operations, Mr. Williams was deliberately

excluded from the team. On September 21, 2021, white executive officers held a secret meeting

where the sole topic was the termination of Mr. Williams's employment.

72.     White officers routinely instructed Mr. Williams's subordinates to circumvent

him, thereby eroding his leadership authority. Junior staff were given direct access to

confidential officer-level communications—including Mr. Williams's personnel records, salary

information, personally identifiable information ("PII"), and private health-related information

("PHI")—contrary to NMCRS policy. No white officer was subjected to similar intrusions. For

example, the CAO and HR forced the hire of IT candidate Jason Kelly in August 2022 against

the IT team's recommendations, usurping Mr. Williams's authority as CIO.

73.     From approximately 2020 through his termination in May 2023, NMCRS denied

Mr. Williams office space commensurate with his executive officer role, instead assigning him to

a cubicle with partial-height walls that provided no privacy for confidential conversations,

personnel matters, or executive-level discussions. Mr. Williams's white peer officers—COO

Dawn Cutler, CAO Chris Dour, CFO Carolyn Bauer, and CDCO Gillian Gonzalez—each

occupied private offices with walls and doors. In July 2020, while Mr. Williams remained in a

cubicle, COO Cutler initiated discussions to provide "commensurate office space" to CDCO Gonzalez, a junior officer with significantly less tenure than Mr. Williams. On July 10, 2020, Mr. Williams submitted a formal written complaint noting the inequity of prioritizing a proper office for the CDCO while the CIO—the most senior officer by tenure—was confined to a cubicle where "a private conversation is not even possible." Despite this complaint, NMCRS took no action to provide Mr. Williams with appropriate executive office space throughout the remainder of his tenure

**Racially Charged Remarks and Failure to Remedy (June 2022)**

74.    On or around June 3, 2022, Chief Operating Officer Dawn Cutler, a white officer, stated that "someone needed to crack the whip on [Mr. Williams]"—a statement carrying explicit racial connotations of slavery and violence when directed at the only Black executive officer. A colleague, Gabriella Telles, reported this explicitly racial remark to HR. HR took no corrective action despite the Society's stated No Tolerance Policy for harassment and discrimination.

75.    COO Cutler routinely violated the Society's policies and demonstrated a pattern of targeting Black employees with hostile and threatening conduct. During the Seabag intranet project, Cutler publicly stated during a meeting that if the project wasn't successful, "people's jobs would be on the line." This threat was reasonably perceived as being directed specifically at Mr. Williams and Thelisha Woods (Black female, Director of Communications), the two original architects and most experienced Black leaders on the project. Multiple individuals complained about COO Cutler's conduct, yet HR took no corrective action. Ms. Woods corroborated the hostile treatment, stating that Cutler would "continue to bully us and make it seem like we are the problem." Ms. Woods also reported that during meetings, COO Cutler would "literally scream" at her and Jodi Briggs (the Asian female IT Director) about issues where Cutler had the

facts wrong, while treating white colleagues gently. This pattern of hostile conduct by COO Cutler toward multiple minority employees—the "crack the whip" remark directed at Mr. Williams, the threats and screaming directed at Ms. Woods and Ms. Briggs—while white officers faced no comparable hostility, demonstrates that the discriminatory animus was pervasive and extended throughout NMCRS leadership.

76.     The concurrent targeting of multiple Black employees by white officers—while similarly situated white officers faced no discipline for comparable or greater performance issues—demonstrated a pattern of racial animus throughout NMCRS leadership. Ms. Woods later stated she felt like a "black token" who was being "constantly undermined." Both Ms. Woods and Mr. Williams discussed how it seemed to be "always us black people being targeted and held to a different standard." Both were scapegoated for the Seabag intranet project failure despite having been excluded from the modernization process.

**Institutional Pattern of Purging Minorities (2018-2024)**

77.     The targeting of Mr. Williams was part of a systematic, multi-year pattern of forcing out Black and minority employees while protecting white employees. Upon information and belief based on organizational knowledge and witness accounts, this pattern of purging minorities from the organization included:

(a) **Nicole Hillare** (Black female employee) was forced out in 2018, the same year Mr. Williams suffered his first heart attack due to workplace stress;

(b) **Sylvia Adams** (Black female, long-tenure employee, Donor Relations Manager) was forced into early retirement. Ms. Adams told Mr. Williams directly that she was leaving because she couldn't take the hostile environment anymore, the racist attitude towards her and other minorities, and the way she was being treated;

26

(c) **Tsui-Ti Lui** (Asian, long-tenured employee) was forced out, while white employee Jan Hansen remained employed, demonstrating disparate treatment based on race;

(d) **Sam Smith** (Black male long-tenured employee) was subjected to racially discriminatory work assignments. Mr. Williams and IT Director Jodi Briggs both witnessed Sam Smith being required to clean up feces after his supervisor defecated in her office chair on multiple occasions, while white employee James Groves (White male employee) was not subjected to the same demeaning requirement, revealing racial bias in day-to-day work assignments and treatment. Sam Smith and James Groves were peers who both reported to Jan Hansen, who in turn reported to CAO Chris Dour. CAO Dour was aware of this discriminatory treatment, contributed to the hostile environment throughout NMCRS, and actively participated in the campaign to terminate Mr. Williams, including co-authoring the September 2020 "Soft Approach" memo and recruiting for Mr. Williams's replacement; and

(e) As detailed elsewhere, **Jodi Briggs** (Asian female long-tenured employee IT Director), Thelisha Woods (Black female long-tenured Director of Communications), Gabriella Telles (Hispanic female long-tenured employee ), and Richard Von Zimmer (gay, mixed-race) were all targeted with harassment, adverse actions, or termination.

78.     This systematic elimination of Black and minority employees while protecting white employees demonstrates that the discrimination against Mr. Williams was not an isolated incident but rather part of an institutional pattern and practice. The pattern spans at least six years

(2018-2024) and affected employees across multiple departments and at various levels, from individual contributors to directors and executive officers. The consistency of this pattern—targeting minorities for removal while protecting whites—establishes that NMCRS maintained and enforced a discriminatory culture that was pervasive, accepted by leadership, and continued unabated despite multiple organizational assessments documenting the hostile environment.

**C. The Fraudulent Performance Improvement Plan and Pre-Replacement**

79.    The decision to terminate Mr. Williams was determined before any disciplinary process began. By July 12, 2022, Chief Administrative Officer Chris Dour and COO Dawn Cutler were already actively recruiting for the CIO position—more than a month before Mr. Williams was ever notified of any performance issues.

**Exploiting Medical and Family Crises**

80.    In July 2022, Mr. Williams took FMLA-protected leave due to a life-threatening medical emergency involving his wife, with his deputy acting in his absence during this profound family crisis.

81.    In April 2022, during another period when Mr. Williams was dealing with the sudden death of his younger brother's wife, NMCRS commissioned the Defense Cyber Security Group ("DCG") to conduct an IT audit. NMCRS excluded Mr. Williams from defining the scope of work and initial vendor selection for the audit of his own department—an exclusion not imposed on other department heads.

82.    This was the second major IT assessment weaponized against Mr. Williams. In 2018, while Mr. Williams was on medical leave recovering from emergency quadruple bypass surgery following a stress-induced heart attack, NMCRS contracted with Harvard Partners to conduct an IT assessment in August 2018. NMCRS excluded Mr. Williams from defining the

scope of work and did not allow him to participate in or respond to the assessment while he was recovering from major cardiac surgery. The Harvard Partners report identified security risks but lacked specifics and tangible evidence according to the financial audit team. CEO Klimp himself later acknowledged to Mr. Williams that the 2018 Harvard Partners report was a "hit job" on Mr. Williams. After the Harvard Partners assessment, Mr. Williams noted his IT teams had been "beaten up on enough for now" and were just starting to recover from the interference. The short notice of the 2022 DCG review brought back "bad memories of the Harvard Partner IT Assessment" for staff, demonstrating the traumatic impact of these assessments.

83.    The Statement of Work (SOW) for the IT and Cybersecurity Assessment was finalized and signed by CEO Klimp on March 16, 2022, and circulated among other officers, but it did not include the CIO—a gross violation of professional standards. Mr. Williams was unaware that a company had been engaged or that the review had begun until COO Dawn Cutler mentioned it on April 4, 2022. Upon information and belief based on evidence Mr. Williams obtained, the COO communicated with the DCG vendor outside official channels and provided the discredited 2018 Harvard Partners report to the vendor, thereby tainting the assessment. The CEO explicitly ordered the vendor to send the final report to him and the COO before it was briefed to anyone else, including the CIO, to ensure they could control the narrative.

84.    The DCG assessment was technical in scope, focusing strictly on IT enterprise and cybersecurity using ITIL and NIST frameworks. The SOW contained no objectives or deliverables related to personnel reviews, management style, or executive coaching. A review of the DCG vendor's services confirmed they had no advertised expertise in personnel reviews, performance management, or executive coaching. Any findings outside the technical scope were therefore outside their professional expertise. The DCG report also contained verifiably false

findings, such as recommending security measures that Mr. Williams had already implemented, including Multi-Factor Authentication and a formal DOD-compliant Risk Management Framework.

85.     NMCRS later used this audit as a primary basis for placing Mr. Williams on a Performance Improvement Plan in August 2022, despite the audit identifying organization-wide systemic issues, not individual performance failures.

**The Coercive PIP Meeting (August 2022)**

86.     On August 23, 2022—shortly after Mr. Williams returned from FMLA-protected leave for his wife's medical emergency—NMCRS placed Mr. Williams on a Performance Improvement Plan.

87.     The PIP was premised on two prior IT assessments (Harvard Partners in 2018 and Defense Cyber Security Group in 2022), both of which were selectively interpreted to blame Mr. Williams for organizational issues far outside his control. NMCRS ignored that the same problems stemmed from chronic understaffing, lack of funding, and a failure by senior leadership—not Mr. Williams—to support the IT modernization efforts he had long championed.

88.     During the August 23, 2022 PIP meeting, CEO Klimp acknowledged that he was glad Mr. Williams's wife was released from the hospital and recuperating, noting it sounded like it might be a long recovery. Despite expressing that he did not want to add more stress to Mr. Williams's life, Klimp used this time to discuss "continuing concerns" about Mr. Williams's role and management. Mr. Williams disclosed that he was under extraordinary medical hardship— including Stage 3 chronic kidney disease, ongoing cardiac stress, severe hypertension, and his wife's ongoing medical crisis. NMCRS proceeded with the PIP as if these conditions did not exist, demonstrating disregard for his medical limitations.

89.    CEO Klimp explicitly stated during the August 23, 2022 PIP meeting that "the common denominator" was "the CIO and the IT department," despite knowing that every other officer involved in the 2018–2022 issues had been replaced—except Mr. Williams, the only Black officer.

90.    Mr. Williams was handed a written PIP. When Mr. Williams asked for time to review the document, CEO Klimp raised his voice, demanded, "Sign it, just sign it!" and threatened to "get Chris and Dawn in here" and discuss "other options" unless he signed immediately. This threat, invoking the two officers known for their racial hostility (CAO Dour and COO Cutler), was intimidating and coercive. Mr. Williams signed under duress.

91.    The PIP criticized Mr. Williams for "missed deadlines," even though the deadlines were impacted by the failure of COO Cutler and CAO Dour to fill IT vacancies for more than two years. Internal communications show that NMCRS officers often stalled, blocked, or ignored Mr. Williams's requests for resources, then blamed him for predictable delays.

92.    The PIP also mandated that Mr. Williams hire an "IT deputy director" to act on his behalf during absences, despite the fact that Jodi Briggs, the IT Director and an Asian female, had already been serving in this capacity since 2017 and had successfully functioned as Acting CIO for 18 months during his cardiac recovery from 2018-2019. Former CEO Steve Abbot had praised her performance as "superb." When Mr. Williams reminded CEO Klimp during the PIP meeting that Ms. Briggs was already his designated deputy, Klimp dismissed her proven service and insisted on hiring a different deputy. This requirement was pretextual and designed to further undermine Mr. Williams's authority by displacing his chosen minority deputy and forcing him to accept a hire he did not want. The forced hire of Jason Kelly in August 2022, against Mr. Williams's and the IT team's recommendations, was the culmination of this decade-long

31

campaign to control his staffing decisions and position a replacement. No other white officer was required to hire a deputy despite documented departmental failures, demonstrating that this requirement was uniquely imposed on the Black CIO as part of the discriminatory campaign.

93.     CEO Klimp claimed in the August 23, 2022 PIP that the DCG report recommended executive coaching for Mr. Williams—a verifiable lie that exposed the PIP as pretextual.

94.     The PIP letter stated that it would be included in the CEO's "turnover" package to the new CEO and that "after three months... there should be a conversation about your future with the Society," demonstrating the PIP was designed as a foundation for termination.

95.     Contemporaneous evidence from the August 23, 2022 meeting confirms that the PIP was a disciplinary measure used to build a paper trail, not a legitimate performance tool, and that Mr. Williams was denied procedural fairness and coerced into signing under threat.

**Sham Coaching Process**

96.     The mandated "coaching sessions" were weekly interrogations during which Mr. Williams was repeatedly criticized and pressured. The coach, Mark Servodidio, was hired without Mr. Williams's input and was a personal friend of Chief Administrative Officer Chris Dour. Mr. Williams's own suggestion for an alternative coach was rejected.

97.     Contemporaneous evidence confirms that the coaching consultant was not independent, but rather coordinating with NMCRS leadership to document Mr. Williams for termination. The intent of the coaching was documented internally: the new CEO, Robert Ruark, and the coach conspired to create a premeditated plan to manage Mr. Williams out, with the objective explicitly being to "Help him orchestrate a graceful exit" if he wouldn't "get on board."

98.    The coach continuously violated confidentiality by creating secret, biased "feedback reports" for the CEO and CAO that were never shared directly with Mr. Williams. Leadership actively colluded with the coach to create fraudulent summaries of the process, which were used to formally "paper the file" for termination.

99.    During the third coaching session on November 24, 2022, the coaching consultant expressly instructed Mr. Williams to "stop documenting things"—a directive that reveals the process was intended to suppress evidence of the hostile environment. This instruction was a shocking breach of professional conduct, intended to prevent Mr. Williams from creating a written record of the ongoing harassment.

100.    The coaching process lacked professional standards, with no formal plan or goals set for Mr. Williams's development. The coach acted as an interrogator, not a neutral facilitator, immediately putting Mr. Williams on the defensive and criticizing him based on the subjective complaints of white officers.

**Public Replacement Recruiting and Predetermined Termination**

101.    On September 25, 2022, NMCRS publicly posted the CIO position while Mr. Williams was supposedly being "coached," confirming the PIP was pretextual and the decision to replace him had been made before the coaching process concluded.

102.    The PIP's unfair application is demonstrated by multiple organizational assessments documenting systemic failures affecting the entire leadership team, yet only Mr. Williams faced discipline. In December 2018, a Culture & Human Resources Assessment found the internal culture at headquarters to be "Hostile/Toxic/Tense," "Racist/Ageist/Militaristic," and characterized by "Territorial/Power Struggles." The assessment noted an increase in harassment

and hostile work environment complaints and recommended engaging a qualified investigator, but initial interviewees believed the results "will not be addressed."

103.    HR had systematic failures under CAO Dour's oversight, which included:

(a) failing to investigate or take corrective action on the racially charged "crack the whip" remark despite a formal complaint from Gabriella Telles;

(b) failing to address documented harassment and threats against multiple employees by COO Dawn Cutler;

(c) failing to implement basic protections against retaliation despite organizational assessments documenting widespread fear among employees; and

(d) failing to conduct proper workplace investigations despite multiple complaints of discrimination and hostile environment.

104.    Despite being responsible for overseeing this systematically dysfunctional HR operation, and despite his documented failure to complete the critical CEO-mandated task of implementing an officer performance evaluation system—with the CEO's own November 2022 Strategic Plan documenting "No progress to date" on this deliverable more than two years after it was assigned—CAO Dour faced no scrutiny, no counseling, no PIP, and no discipline. This stands in stark contrast to the intensive scrutiny, punitive coaching, fraudulent PIP, and ultimate termination imposed on Mr. Williams, the only Black executive officer.

105.    An independent Team 360 Review was delivered to leadership in August 2022 and finalized on October 31, 2022. The review found the officer and director cohort received a collective "D" grade for team health (64.8%). Categories cited in Mr. Williams's PIP—such as Communication, Relationships, and Execution—received failing scores (D or F) organization-wide. The report indicated that executive leadership suffered from "critically low" trust and was

34

in the "At-Risk Zone." Despite these findings proving the issues were systemic and affecting all officers, the report was allegedly withheld from the Board of Directors. No other officers were reprimanded, placed on PIPs, or subjected to additional scrutiny based on these damning results. Instead, the findings were selectively used as pretext to target Mr. Williams, the only Black executive officer, who was placed on a PIP around this same time.

106.    The absence of a formal officer performance evaluation system—despite multiple assessments recommending its creation and despite it being assigned as a CEO priority to CAO Dour—critically undermined the credibility of the performance-based PIP imposed on Mr. Williams. The Society subjected Mr. Williams to intense, subjective scrutiny and a punitive PIP despite its own internal reports confirming no formal evaluation system existed for officers. This selective discipline applied only to the Black executive officer, while white officers failed to deliver on major mandates without consequence, demonstrates disparate treatment and pretextual performance management

107.    Similarly situated white officers were treated more favorably:

**CAO Chris Dour's Failure Without Consequences:**

(a) CAO Chris Dour failed to implement the mandated standardized officer-evaluation system by year-end 2022, a CEO-priority deliverable, with internal documents confirming "No progress to date." Despite this documented failure of a critical organizational initiative affecting the entire officer cohort, he faced no PIP, no replacement recruiting, no heightened scrutiny, and no discipline. Instead, he actively participated in the campaign against Mr. Williams, co-authoring the "Soft Approach" memo and, upon information and belief, recruiting for Mr. Williams's replacement.

**CDCO Gillian Gonzalez's Multiple Failures and Hostile Conduct:**

(b) CDCO Gillian Gonzalez, a white female officer, failed to deliver the Campaign

Plan, a strategic fundraising deliverable documented as "Not Started" in late 2022.

Despite this failure to produce a core departmental deliverable, she faced no

discipline and received supportive, developmental coaching designed to help her

succeed. In stark contrast, Mr. Williams's "coaching" was punitive, coordinated

with leadership to document him for termination, and included the coach

instructing him to "stop documenting things"—a directive designed to suppress

evidence of the hostile environment.

During Mr. Williams's coaching sessions, CDCO Gonzalez provided only vague,

subjective complaints, admitting her concerns were based on "a feeling" and

explicitly stating "I don't have like specific examples"—criticism lacking any

objective basis. Despite providing only feelings-based complaints and failing to

complete her own major strategic deliverable, CDCO Gonzalez faced no

comparable scrutiny or accountability.

Beyond her failure to complete assigned deliverables and her role in the pretextual

coaching process, CDCO Gonzalez actively contributed to the hostile

environment through multiple acts:

    (i) **Public disrespect and racial subordination:** CDCO Gonzalez

        overstepped her authority by directing the accounting department not to

        process payment for Mr. Williams's participation in a professional

        networking golf tournament—a business expense within his executive

        discretionary authority. This public interference with Mr. Williams's

executive prerogatives, done without consulting him and in front of junior staff, constituted racial subordination designed to undermine his authority and demonstrate that the Black CIO could be publicly overruled by a more junior white officer.

(ii) **Idea theft from minority employee:** Upon information and belief based on reports from Director Thelisha Woods to Mr. Williams, CDCO Gonzalez engaged in a pattern of dismissing Ms. Woods's ideas during meetings or pretending not to listen, only to later present those same ideas as her own original thoughts. This conduct undermined and stole credit from a Black female subordinate, demonstrating the racially hostile treatment extended to other minority employees associated with Mr. Williams.

(iii) **Cronyism to Manufacture IT Dysfunction Narrative**:

Upon information and belief, CDCO Gonzalez hired Mary Getz, an individual with a close personal relationship to CDCO Gonzalez, as a consultant to critique IT operations. This hiring contributed to the manufactured narrative of IT dysfunction used to justify Mr. Williams's PIP and termination, rather than providing an objective, independent assessment of IT performance.

(iv) **Subjective scrutiny without accountability:** Despite providing only feelings-based complaints lacking specific examples during Mr. Williams's coaching—and despite her own documented failure to complete a major strategic deliverable—CDCO Gonzalez faced no

comparable scrutiny, no requirement to provide objective evidence for her criticisms, and no accountability for her own performance failures. The disparate treatment is stark: a white female officer who failed to deliver a strategic funding raising plan, provided only vague "feelings" as criticism, publicly disrespected the Black CIO, stole ideas from a Black female employee, and engaged in cronyism received supportive coaching and faced no discipline, while the Black CIO who delivered major technology transformations and maintained 99.9% uptime was subjected to punitive coaching based on those same vague feelings and ultimately terminated;

(c) **COO Dawn Cutler** failed to deliver the organization-wide Strategic Business Plan assigned to her role. Despite this failure and despite making the racially charged "crack the whip" remark about Mr. Williams (reported to HR but left unremedied), she faced no discipline, no PIP, no heightened scrutiny, and no threat of termination. She remained in good standing and continued to participate in the campaign to remove Mr. Williams; and

(d) **HR Director Tracy Brownstein** oversaw an HR Department that was identified in two major organizational assessments (2018 Culture & HR Assessment and 2020 Gaudio Report) as having significant systemic failures, including "loss of confidence in the HR Process." The 2018 assessment documented increases in harassment and hostile work environment complaints and an EEOC complaint. The 2020 Gaudio Report explicitly confirmed ongoing "loss of confidence in the HR Director and HR Process" and documented HR's failure to address the toxic

environment and protect employees from harassment by officers. Despite these documented failures by HR—failures that directly contributed to the hostile work environment experienced by Mr. Williams and other employees—HR Director Brownstein and COA Chris Dour faced no external assessment of their department, no PIP, no coaching, no requirement to hire a deputy, and no heightened scrutiny.

108.    None of these white officers were placed on a PIP, disciplined, subjected to replacement recruiting, or warned that their employment was at risk due to delayed or incomplete deliverables. Each remained employed in good standing beyond Mr. Williams's termination.

109.    The plan to terminate Mr. Williams was finalized on or about October 2022, when outgoing CEO Klimp who placed Mr. Williams on a PIP after announcing his retirement on July 14, 2022 provided incoming CEO Robert Ruark with a dossier described as a "hit file" - the same file provide to him by former COO Pete Collins containing negative information and instructed him that the "first thing he needed to do was to fire Willie," referring to Mr. Williams. This directive was given before CEO Ruark had formally assumed his position or independently assessed Mr. Williams's performance, proving that the decision to terminate Mr. Williams was predetermined.

**D. Medical Condition, FMLA Request, and Termination During Cardiac Recovery Pattern of Exploiting Medical Crises**

110.    NMCRS's May 2023 termination during Mr. Williams's cardiac recovery was part of a deliberate pattern of exploiting his medical vulnerabilities. In 2018, while he recovered from quadruple bypass surgery, NMCRS conducted an IT assessment excluding him from participation and later used it against him despite CEO Klimp acknowledging it was a "hit job."

In April 2022, during a family death, NMCRS conducted another IT audit without his input and used it as the basis for his August 2022 PIP. In May 2023, NMCRS terminated Mr. Williams nineteen days after his heart attack and one day after he requested FMLA leave. In each instance, NMCRS used his medical or personal crises as opportunities for adverse action.

**Escalating Health Crisis**

111.    In early 2023, Mr. Williams experienced escalating, documented health issues – migraines, vertigo, and cardiac symptoms. On April 05, 2023, just one month before his heart attack, Mr. Williams reported he was out of the office due to "not sleeping and severe migraine headaches," noting the physical and psychological harm caused by the hostile environment. CEO Ruark first observed Mr. Williams exhibiting slurred speech—a medical symptom—in February 20 2023 and again around May 3-4, 2023.

112.    On May 4, 2023, Mr. Williams suffered a severe heart attack (NSTEMI) resulting in hospitalization, elevated troponin levels, and a diagnosis requiring cardiac rehabilitation. His treating cardiologist later documented that the heart attack was directly linked to occupational stress arising from the hostile work environment and was a significant contributing factor to both his 2018 and 2023 heart attacks.

113.    Mr. Williams was discharged with strict medical restrictions, including bed rest, urgent follow-up with his cardiologist, limitations on activities requiring mental alertness such as driving or using machinery, and enrollment in cardiac rehabilitation.

**FMLA Requests and Immediate Termination**

114.    On May 16, 2023—twelve days after his heart attack—Mr. Williams verbally notified Chief Administrative Officer Chris Dour and Chief Financial Officer Carolyn Bauer that he needed FMLA leave and short-term disability to begin physician-directed cardiac

rehabilitation. He explained the serious nature of his condition and his physician's directive to begin rehabilitation. The officers told him they would "talk about it later," deferring any discussion of his leave request.

115.    On May 22, 2023, Mr. Williams submitted his formal written request for FMLA leave and short-term disability accommodations to NMCRS leadership and Human Resources, including an attached schedule showing his cardiac rehabilitation appointments beginning May 24, 2023. This written request provided NMCRS with specific information about the nature of his condition, the need for leave, the anticipated duration, and the planned start date of treatment.

116.    The very next day—May 23, 2023—NMCRS terminated him via phone call, presenting him with an ultimatum. NMCRS never provided any FMLA-related paperwork, never engaged in any dialogue about his leave needs, and never made any attempt to process his request despite having written notice with supporting medical documentation.

117.    The ultimatum: if Mr. Williams agreed to "retire," his last day would be June 30, 2023; if he refused, he would be terminated effective June 2, 2023.

118.    This date range was not arbitrary. Mr. Williams's 25th service anniversary—a major pension and benefits milestone—was June 28, 2023. The "retirement" offer was designed to induce voluntary separation or, if he refused, punish him by terminating him before his anniversary.

119.    The termination occurred nineteen days after his heart attack, seven days after he disclosed his FMLA need, and one day after he submitted his formal written FMLA request with his cardiac rehabilitation schedule.

**Immediate Medical Harm from Termination**

120.    On May 24, 2023—the day after his termination and his scheduled first day of cardiac rehabilitation—Mr. Williams suffered syncope (loss of consciousness) and collapsed during his first cardiac rehabilitation session. He was re-hospitalized following this event. Medical providers attributed this specific event to acute stress exacerbated by NMCRS's termination, demonstrating that NMCRS's conduct caused immediate physical harm during his cardiac recovery.

121.    Despite being on notice of his serious health condition, multiple requests for protected leave, and his medical incapacity, NMCRS never addressed or processed his FMLA or short-term disability request.

**Continued Coercion During Medical Incapacity**

122.    On June 7, 2023, CEO Ruark called and pressured Mr. Williams for an immediate decision on the separation terms, stating, "I need it today. We've been waiting a long time, Willie." Mr. Williams informed leadership that he was suffering from vertigo and cognitive difficulties and was not in a condition to review or decide on the complex legal documents. Leadership had received prior notice from his wife that he was under doctor's orders with restricted electronics use and was medically unable to make decisions requiring sustained concentration.

123.    During a follow-up call the same day, CAO Dour admitted the company's true position, stating that the CEO had technically already let him go, and he was "technically terminated" on May 23, 2023. The continued pressure to sign a resignation was an effort to create a false narrative and cover up an unlawful termination.

124.    NMCRS conditioned the continuation of his active health insurance coverage and COBRA premium payments on him agreeing to sign the severance package and general release, which waived his legal rights. He declined to sign, and his active health insurance coverage ended on or about June 30, 2023, leaving him without coverage during his critical cardiac recovery.

125.    As a direct result of NMCRS's unlawful conduct, Mr. Williams suffered loss of income, loss of health insurance during cardiac recovery, emotional distress, reputational damage, and significant financial hardship. The extreme stress led to a mental health crisis on July 16, 2023, requiring police intervention after a clinician reported concerning communications about suicidal ideations. The police report documented that the crisis was linked to his job loss and severe stress. Mr. Williams required psychiatric treatment for PTSD symptoms, anxiety, and sleep disturbance. He continues to suffer ongoing mental and physical health consequences exacerbated by the stress of NMCRS's actions.

**E. Post-Termination Obstruction and Continuing Discrimination**

126.    NMCRS's unlawful conduct did not end with Mr. Williams's termination. Instead, NMCRS engaged in a pattern of obstruction, privacy violations, and conduct designed to conceal its unlawful actions and retaliate against Mr. Williams for pursuing his legal rights.

**False Public Announcement**

127.    On June 27, 2023, the CEO issued an organization-wide email falsely stating Mr. Williams had "retired." This announcement was made without Mr. Williams's knowledge or consent while he was on protected medical leave recovering from a heart attack and syncope event. The email contained effusive praise, calling Mr. Williams a "standard-bearer" who left an "indelible mark of commitment and accomplishments" and dedicated his "heart," "positive

energy," and "technical expertise" to the Society. This public praise directly and completely contradicted the secret, pretextual "poor performance" narrative that leadership had manufactured to justify his removal.

128.    Furthermore, NMCRS leadership COA Dour reached out to Mr. Williams after his termination to solicit his services as a "1099" independent contractor to assist with turnover. This offer, made after terminating him for alleged "loss of trust and confidence," is further evidence that the stated reasons for his termination were false. The CAO re-extended an offer for a 1099 contractor role on August 17, 2023

129.    In the same email message on August 17 2023 COA Dour added a gratuitously cruel detail: he informed Mr. Williams that CEO Ruark had already selected and announced Mr. Williams's replacement. This callous disclosure—made nearly three months after Mr. Williams's May 23, 2023 termination and while Mr. Williams was still recovering from the termination-induced medical crisis—demonstrated NMCRS's willful disregard for Mr. Williams's wellbeing and its deliberate infliction of additional emotional distress by emphasizing that the organization had moved forward without him while he struggled with the physical and psychological consequences of his unlawful termination.

**Post-Termination Privacy Violations and Unauthorized Disclosure of Protected Information**

130.    NMCRS's retaliation and discrimination against Mr. Williams did not end with his termination; it intensified. In October and November 2023—five to six months after forcing him out while he was recovering from a second heart attack—NMCRS leadership deliberately granted a newly hired junior employee, Manmeet (less than six months' tenure), full, unmonitored access to Mr. Williams's 25-year executive email account.

131.    That account contained highly sensitive and legally protected categories of information belonging to Mr. Williams, including:

(a) Private medical communications with Human Resources about his 2018 quadruple bypass surgery, his May 2023 NSTEMI, cardiac rehabilitation, FMLA requests, and disability accommodations (protected health information, or PHI);

(b) Documents containing his Social Security number and other personally identifiable information;

(c) Confidential officer-level personnel records, salary information, and performance-related correspondence; and

(d) Sensitive communications with senior military officials and internal deliberations concerning other employees.

132.    Granting this junior employee unrestricted access violated:

(a) The Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d et seq., and its implementing regulations, which prohibit unauthorized disclosure of individually identifiable health information;

(b) NMCRS's own Employee Handbook and Confidentiality Policy, which require medical records, personnel files, and other confidential information to be disclosed only on a strict need-to-know basis and with written authorization; and

(c) Basic data-privacy obligations under federal and Virginia law owed to former employees.

(d) No similarly situated white officer—whether current or separated—has ever had their private medical records, Social Security number, or executive correspondence exposed in this manner after leaving the organization.

133.    On at least one documented occasion in this same period, Manmeet asked a colleague for permission to send an email to Marine Corps Base Quantico using Mr. Williams's email identity—an attempt at impersonation that underscores the complete collapse of internal controls and the deliberate disregard for Mr. Williams's privacy rights.

134.    This post-termination intrusion was not accidental. Conducted months after Mr. Williams asserted his rights under Title VII, the ADA, and the FMLA, it constitutes continuing retaliation, further evidence of racial animus, and an intentional effort to inflict additional harm on the organization's only Black executive officer.

**Continuing Pattern: November 2024 Reduction in Force**

135.    In November 2024—approximately eighteen months after Mr. Williams's May 23, 2023 termination—NMCRS conducted a Reduction in Force ("RIF") that eliminated the Communications and Development department, resulting in the termination of multiple employees who had been vocal about workplace discrimination or had supported Mr. Williams's complaints about discriminatory treatment. The November 2024 RIF demonstrates the persistence of the discriminatory and retaliatory pattern that had begun with the 2017 Collins racist remarks, continued through Mr. Williams's 2023 termination during medical leave, and extended to the elimination of employees associated with challenging workplace discrimination.

136.    The employees terminated in the November 2024 RIF were minorities:

(a) Thelisha Woods, a Black female employee serving as Director of Communications. Ms. Woods was terminated just days after her twentieth anniversary with NMCRS, despite her long tenure and institutional knowledge. Prior to her termination, Ms. Woods had communicated to Mr. Williams about experiencing a discriminatory work environment, including her perception that

leadership wanted a "black token but not someone who is vocal and has ideas to improve the team" and her belief that she was being undermined. Ms. Woods and Mr. Williams had discussed their shared experiences of being "targeted and held to a different standard" compared to white colleagues. Upon information and belief based on statements made to Ms. Woods and reports from individuals with direct knowledge, HR Director Tracy Brownstein had previously told Ms. Woods that "she listened to Willie too much," and COO Cutler had stated that Ms. Woods needed to go because she was "too tied to Willie."

(b) Gabriella Telles, a Hispanic female employee in the Communications and Development department, was also terminated in the November 2024 RIF. In June 2022, Ms. Telles had reported to HR that EVP/COO Cutler made the racially charged "crack the whip" remark about Mr. Williams during an executive leadership meeting. Despite Ms. Telles's report of racially insensitive language by a senior officer, NMCRS took no corrective action against COO Cutler and did not discipline or counsel her regarding the use of racially charged language in the workplace. Prior to the RIF, Ms. Telles had been denied the ability to work from home while similarly situated white employees were permitted to work remotely, reflecting disparate treatment based on race.

## COUNT ONE
## DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF
## 42 U.S.C. § 1981
### (against Navy-Marine Corps Relief Society)

137.    Mr. Williams incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

138.    Mr. Williams is Black and thus a member of a protected class. He had a contractual employment relationship with NMCRS and, for nearly 25 years, successfully performed the essential functions of his role as Vice President and Chief Information Officer.

139.    NMCRS intentionally discriminated against Mr. Williams because of his race with respect to the making, performance, and termination of his employment contract, including, inter alia:

(a) Stripping his longstanding executive authorities and excluding him from key meetings and strategic decisions;

(b) Placing him on a fraudulent Performance Improvement Plan in August 2022 after leadership had already begun recruiting for his replacement in July 2022;

(c) Publicly posting his position and actively recruiting his replacement while he remained employed; and

(d) Terminating his employment on May 23, 2023, pursuant to a coordinated plan predetermined by the outgoing CEO's directive to the incoming CEO that the "first thing he needed to do was to fire Willie."

(e) Similarly situated white officers were not subjected to comparable discipline, Performance Improvement Plans, or replacement recruiting despite failing to complete major assigned strategic deliverables:

(f) CAO Chris Dour failed to implement the mandated standardized officer-evaluation system by year-end 2022, a CEO-priority deliverable, with internal documents confirming "No progress to date." Despite this documented failure of a critical organizational initiative, he faced no PIP, no replacement recruiting, no heightened scrutiny, and no discipline;

(g) CDCO Gillian Gonzalez failed to deliver the FY23 Campaign Plan, a strategic fundraising deliverable documented as "Not Started" in late 2022. Despite this failure to produce a core departmental deliverable, she faced no discipline and received supportive, developmental coaching, whereas Mr. Williams's "coaching" was punitive and coordinated with leadership to build a termination record;

(h) COO Dawn Cutler failed to deliver the organization-wide Strategic Business Plan assigned to her role. Despite this failure and despite making the racially charged "crack the whip" remark about Mr. Williams—which was reported to HR but left unremedied—she faced no discipline, no PIP, and no threat of termination; and

(i) HR Director Tracy Brownstein oversaw an HR Department identified in two major organizational assessments (2018 and 2020) as having significant systemic failures, including "loss of confidence in the HR Director and HR Process." Despite these documented failures that directly contributed to the hostile work environment, she faced no external assessment, no PIP, no coaching, no requirement to hire a deputy, and no discipline.

140.    NMCRS selectively enforced alleged performance expectations against Mr. Williams, the only Black executive officer in the organization's 119-year history, while white officers who failed to complete major strategic deliverables faced no comparable discipline or accountability. This disparate treatment demonstrates that race was a determinative factor in the adverse actions taken against Mr. Williams.

141.    NMCRS's stated reasons for the adverse actions were false and pretextual, as demonstrated by:

(a) COO Cutler's "crack the whip" remark left unremedied: On or about June 3, 2022, COO Dawn Cutler, a white officer, stated that "someone needed to crack the whip on [Mr. Williams]," a statement carrying explicit racial connotations when directed at the organization's only Black executive officer. This remark was reported to HR by colleague Gabriella Telles, yet HR took no corrective action. Less than three months later, Mr. Williams was placed on a Performance Improvement Plan, supporting an inference that racial animus motivated the adverse action;

(b) The Team 360 Review finding organization-wide failures: An independent Team 360 Review finalized in October 2022 found that the officer and director cohort received a collective "D" grade for team health, with categories cited in Mr. Williams's PIP—Communication, Relationships, and Execution—receiving failing scores (D or F) organization-wide. The report concluded that executive leadership suffered from "critically low" trust and was in the "At-Risk Zone." These findings demonstrate that the issues cited in Mr. Williams's PIP were systemic leadership failures affecting the entire executive team, not deficiencies unique to Mr. Williams. Yet he was the only officer placed on a PIP or subjected to heightened scrutiny;

(c) The "witch hunt" characterization from NMCRS's own counsel: In a formal legal response dated April 15, 2020, NMCRS's outside counsel, Wilson Elser, characterized the campaign against Mr. Williams as a "witch hunt" targeting "one of his colleagues (who happens to be a Black male)" and confirmed that NMCRS's internal investigation "did not find any fraud or financial impropriety

by CIO Williams." Despite this formal exoneration by NMCRS's own legal
counsel, CEO Klimp and subsequent leadership nevertheless continued to target
Mr. Williams for removal through the August 2022 PIP and May 2023
termination;

(d) CEO Klimp's October 15, 2021 praise followed by a PIP ten months later: On
October 15, 2021, CEO Jack Klimp—the same CEO who later issued the PIP—
relayed high praise for Mr. Williams's cybersecurity leadership from Advisory
Council member Admiral T.J. White, an external national security expert, noting
that Mr. Williams and his team were "doing exactly what is needed." CEO Klimp
also publicly praised Mr. Williams's IT accomplishments in his July 2022
retirement announcement. Despite this documented recognition of exemplary
performance, Mr. Williams was placed on a fraudulent PIP approximately ten
months later in August 2022, shortly after returning from FMLA-protected leave,
demonstrating that the stated performance concerns were pretextual;

(e) The outgoing CEO's directive to "fire Willie": In or around March 22, 2023,
outgoing CEO Jack Klimp provided incoming CEO Robert Ruark with a dossier
of negative information and instructed him that the "first thing he needed to do
was to fire Willie," referring to Mr. Williams. This directive was given before
CEO Ruark had formally assumed his position or independently assessed Mr.
Williams's performance, proving that the decision to terminate Mr. Williams was
predetermined and not based on legitimate performance concerns. The subsequent
termination on May 23, 2023, was the execution of this predetermined plan;

(f)  The CAO Estes email revealing racial animus in personnel decisions: In a November 1, 2017 email, CAO Kathy Estes framed a deputy personnel decision in explicitly racial and gendered terms, stating to CEO Steve Abbot: "The optics are not good. We have an older, white male whose black boss allegedly promised him a position... and then gave the responsibility to an Asian female." This statement reveals the discriminatory animus underlying the campaign—white officers were uncomfortable with a Black executive officer making personnel decisions that did not favor white male employees and demonstrates the racial animus underlying NMCRS leadership's campaign against Mr. Williams; and

(g)  The Gaudio Report documenting conspiracy to eliminate Williams: Upon information and belief based on briefings and witness accounts, the 2020 Gaudio Report documented a "deliberate effort" by white officers to "undermine the authority of IT and particularly the CIO" and to conspire to "eliminate Williams and outsource the IT Department," demonstrating that the adverse actions were part of a coordinated, racially motivated campaign rather than legitimate performance management.

(h)  MCRS manufactured performance critiques through the use of consultants with personal ties to C-suite officers rather than independent, qualified IT assessments. CDCO Gonzalez hired a personal friend to evaluate IT operations despite the consultant's lack of IT expertise, and the resulting critique—generated through this cronyism—was used to justify the PIP against Mr. Williams. Meanwhile, CDCO Gonzalez herself had failed to deliver the CEO-mandated FY23 Campaign

Plan but received supportive coaching rather than discipline, demonstrating that performance deficiencies were manufactured selectively against Mr. Williams.

142.    Mr. Williams's race was the but-for cause of the adverse actions taken against him, in violation of 42 U.S.C. § 1981. The coordinated campaign to remove the organization's first and only Black executive officer—documented through racially charged remarks, the CAO Estes email revealing racial discomfort with Black authority, a formal "witch hunt" acknowledgment by NMCRS's own counsel, the Gaudio Report documenting conspiracy, predetermined removal plans, and disparate treatment compared to white officers—establishes that Mr. Williams would not have been subjected to these adverse actions but for his race.

143.    NMCRS's conduct was undertaken with malice or reckless indifference to Mr. Williams's federally protected rights. Senior managerial agents—including CEO Jack Klimp, incoming CEO Robert Ruark, COO Dawn Cutler, CAO Chris Dour, and CFO Carolyn Bauer—acting within the scope of their employment, engaged in a coordinated, multi-year campaign of racial discrimination. The campaign included circulating an internal memo in September 2020 titled "SOFT APPROACH... TIME TO MOVE ON" that explicitly instructed the CEO "(this is not the time to discuss any of his performance issues)," proving the removal plan was predetermined and not performance-based. The malice and reckless indifference are further demonstrated by the fact that NMCRS exploited Mr. Williams's medical vulnerabilities as opportunities for adverse action, including terminating him nineteen days after a cardiac event and one day after he requested FMLA leave.

144.    As a direct and proximate result of NMCRS's unlawful conduct, Mr. Williams has suffered and continues to suffer significant damages, including lost wages, lost benefits

(including pension benefits lost by termination before his June 28, 2023 25-year service anniversary), emotional distress, reputational harm, and other compensatory damages.

145.    Mr. Williams is entitled to compensatory and punitive damages under 42 U.S.C. § 1981, which has no statutory cap on damages.

**COUNT TWO**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981**
**(against Navy-Marine Corps Relief Society)**

146.    Mr. Williams incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

147.    Mr. Williams is Black and was the first and only Black executive officer in NMCRS's 119-year history.

148.    Section 1981 guarantees all persons the same right to make and enforce contracts, including the terms and conditions of employment, as is enjoyed by white citizens. No administrative exhaustion is required.

149.    Mr. Williams was subjected to unwelcome harassment because of his race, which was severe and pervasive. This harassment included, without limitation:

(a) On or about June 3, 2022, COO Cutler's racially charged remark: COO Dawn Cutler, a white officer, stated that someone needed to "crack the whip" on Mr. Williams—a racially charged remark carrying explicit connotations of slavery and violence when directed at the only Black officer in the organization. This remark was reported to HR by colleague Gabriella Telles, yet HR took no corrective action despite the Society's stated No Tolerance Policy for harassment and discrimination;

(b) Racially derogatory characterization by former white officer: Former COO Pete Collins, a white officer, referred to Mr. Williams's IT department as being run by "a black, an Asian, and a Jew," explicitly targeting Mr. Williams (Black), IT Director Jodi Briggs (Asian female), and Network Engineer Michael Yampolsky (Jewish male) based on their race, ethnicity, and religion. This derogatory characterization was part of a broader pattern of racist and demeaning comments made by Collins that led to his eventual termination in February 2020 after employees submitted a formal complaint to the Board alleging his comments were "derogatory, racist, intimidating, and demeaning to staff";

(c) Pattern of targeting Black employees: COO Cutler also directed racially hostile conduct toward another Black female employee, Thelisha Woods, Director of Communications, including threatening termination and publicly screaming at Ms. Woods and Jodi Briggs (Asian female IT Director) during meetings while treating white colleagues gently. Multiple individuals complained about this conduct, yet HR took no corrective action. This pattern of concurrent targeting of multiple minority employees while white officers faced no discipline demonstrated racial animus throughout NMCRS leadership;

(d) "Witch hunt" acknowledgment by NMCRS's own counsel: In April 2020, NMCRS's outside counsel, Wilson Elser, formally documented in a legal response that the internal investigation of Mr. Williams appeared to be a "witch hunt" targeting "one of his colleagues (who happens to be a Black male)," while confirming "no fraud or financial impropriety by CIO Williams." Despite this formal acknowledgment that the campaign against Mr. Williams was racially

motivated and baseless, NMCRS leadership continued the hostile conduct and ultimately terminated him;

(e) Systematic exclusion and disempowerment after protected complaints: Following Mr. Williams's July 17, 2019 formal complaint to the Board detailing a "toxic work environment" and citing "derogatory and arguably racist comments," white officers engaged in a coordinated campaign of exclusion and disempowerment. This included removing him from the signature authority list in January 2020 (while all white officers retained theirs), stripping his 15-year hiring authority in June-July 2020, excluding him from key meetings and strategic decisions, attempting to amend bylaws to remove him from the line of succession based on his non-military status, denying him office space commensurate with his executive role while white officers received appropriate offices, and publicly excluding him from team recognition in officer meetings where CEO Klimp individually named and praised each white officer while skipping over Mr. Williams as if he were invisible—conduct that occurred on two separate occasions;

(f) Fraudulent Performance Improvement Plan as racial harassment: Placement on a PIP in August 2022 after leadership had already begun recruiting for his replacement in July 2022—more than a month before the PIP was issued—while similarly situated white officers who failed to complete major strategic deliverables faced no discipline. The pretextual nature of the PIP, combined with its timing shortly after Mr. Williams returned from FMLA-protected leave and the

fact that leadership was already recruiting his replacement, demonstrates it was part of the racially hostile campaign rather than a legitimate performance tool;

(g) Predetermined removal directive demonstrating racial animus: In March 2023, the outgoing CEO told the incoming CEO that his "first task" was "to fire Willie," demonstrating that the decision to remove the organization's only Black executive officer was predetermined before the new CEO had assumed office or independently assessed performance, further evidencing that the hostile environment was designed to achieve his removal based on race; and

(h) Multi-year pattern of purging Black and minority employees: The hostile environment extended beyond Mr. Williams to include the systematic elimination of multiple Black and minority employees including Nicole Hillary (Black female, forced out 2018), Sylvia Adams (Black female, forced into early retirement), Tsui Ti Lui (Asian, forced out), and the November 2024 RIF that eliminated only minority employees (Thelisha Woods, Gabriella Telles, Richard Von Zimmer), demonstrating an institutional pattern of racial hostility affecting multiple employees over multiple years.

150. The harassment described above was severe or pervasive under both subjective and objective standards. The conduct spanned multiple years, involved multiple senior officers including the CEO and COO, included explicitly racially charged and bigoted language ("crack the whip," "a black, an Asian, and a Jew"), systematic exclusion from core leadership functions, manufactured discipline through a fraudulent PIP, public dehumanization through the "invisible Black officer" incidents, and culminated in tangible employment actions (the PIP and termination). The pattern demonstrates that the hostile environment was not merely offensive but

was designed to isolate, disempower, and ultimately remove Mr. Williams because of his race. A reasonable person in Mr. Williams's position would find this environment abusive, hostile, and intimidating, and Mr. Williams subjectively experienced it as such, as evidenced by his formal complaints and the documented stress-induced cardiac events he suffered.

151.    Similarly situated white officers were not subjected to comparable hostility, scrutiny, or discipline, demonstrating the race-based nature of the harassment:

(a) CAO Chris Dour failed to make any progress on implementing the mandated standardized officer-evaluation system, a CEO-priority deliverable, with internal documents confirming "No progress to date" as of late 2022. Despite this documented failure of a critical organizational initiative, he received no PIP, no heightened scrutiny, no discipline, and no threats. Instead, he was a central participant in the campaign against Mr. Williams, co-authoring the "Soft Approach" memo and actively recruiting for Mr. Williams's replacement;

(b) CFO Carolyn Bauer, a white officer, was involved in a phishing/wire-transfer incident that resulted in financial loss to NMCRS. When Mr. Williams, as CIO, properly reported the security incident to leadership in accordance with his responsibilities, leadership responded with hostility toward him rather than addressing the security failure or holding CFO Bauer accountable. CFO Bauer faced no discipline, no PIP, no heightened scrutiny, and no adverse consequences, while Mr. Williams was blamed for identifying the problem; and

(c) CDCO Gillian Gonzalez, a white officer, failed to deliver the FY23 Campaign Plan, a strategic fundraising deliverable documented as "Not Started" in late 2022. She received supportive, developmental coaching designed to help her

succeed, whereas Mr. Williams's "coaching" was punitive, coordinated with

leadership to document him for termination, and included the coach instructing

him to "stop documenting things"—a directive designed to suppress evidence of

the hostile environment.

152.    Human Resources received multiple reports of racially hostile conduct, including

the June 2022 report of the "crack the whip" remark and complaints about threats to Mr.

Williams and Ms. Woods, but took no corrective action. Senior leadership, including the CEO

and COO authored and circulated the September 2020 "Soft Approach" memo that explicitly

outlined a plan to force Mr. Williams's removal while avoiding discussion of performance

issues, and the outgoing CEO directed Mr. Williams's termination as the incoming CEO's "first

task." Because the harassers were supervisors and C-suite leadership, and because the hostile

environment culminated in tangible employment actions (the fraudulent PIP and termination),

liability is imputable to NMCRS under principles of agency and strict liability.

153.    NMCRS's conduct unreasonably interfered with Mr. Williams's work

performance, created an intimidating and offensive work environment, and altered the terms and

conditions of his employment. The systematic campaign of racial harassment deprived him of the

benefits, privileges, terms, and conditions of the contractual employment relationship guaranteed

by § 1981, including the ability to perform his duties without race-based hostility, exclusion, and

manufactured discipline.

154.    Mr. Williams's race was a cause of the hostile work environment and the resulting

adverse actions, in violation of 42 U.S.C. § 1981.

155.    NMCRS's conduct was undertaken with malice or reckless indifference to Mr.

Williams's federally protected rights. The deliberate nature of the campaign is evidenced by the

September 2020 "Soft Approach" memo, the "fire Willie" directive, NMCRS's own counsel's "witch hunt" characterization, the CAO Estes email revealing racial discomfort with Black authority over white employees, the Gaudio Report documenting conspiracy, and the systematic coordination among multiple C-suite officers to achieve Mr. Williams's removal.

156.    The pattern of race-based hostility extended beyond Mr. Williams's termination, demonstrating the pervasive nature of the discriminatory environment. In November 2024, NMCRS conducted a Reduction in Force eliminating only minority employees—Director Thelisha Woods (Black female), Gabriella Telles (Hispanic female), and Richard Von Zimmer (gay, mixed-race)—while protecting recently hired white employees. HR Director Tracy Brownstein admitted to Ms. Woods that she was being terminated because she "listened to Willie too much," and upon information and belief, COO Dawn Cutler similarly stated Woods was "too tied to Willie," demonstrating that the racial animus against Mr. Williams extended to other minority employees associated with him.

157.    As a direct and proximate result of NMCRS's unlawful conduct, Mr. Williams has suffered and continues to suffer significant damages, including lost wages, lost benefits, emotional distress, reputational harm, and other compensatory damages. The racially hostile environment directly contributed to the stress-induced cardiac events Mr. Williams suffered in January 2018 and May 2023, with his treating cardiologist documenting that occupational stress was a significant contributing factor to both events.

158.    Mr. Williams is entitled to compensatory and punitive damages under 42 U.S.C. § 1981, which has no statutory cap on damages.

**COUNT THREE**
**DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(against Navy-Marine Corps Relief Society)**

159.    Mr. Williams incorporates by reference all preceding paragraphs of this

Complaint as if fully set forth herein.

160.    Mr. Williams is Black and was the first and only Black executive officer in

NMCRS's 119-year history.

161.    He timely filed an EEOC charge on March 18, 2024, alleging race discrimination,

hostile work environment, and retaliation. On June 18, 2025, the EEOC issued a Notice of Right

to Sue, which Mr. Williams received on July 17, 2025. This action was filed within ninety days

of receipt.

162.    The racially hostile and discriminatory conduct occurring before May 24, 2022

(300 days before the March 18, 2024 EEOC charge) is part of the same unlawful employment

practice that culminated in Mr. Williams's May 23, 2023 termination and continued through

post-termination conduct, including the November 2024 Reduction in Force targeting minority

employees. The acts described constitute a continuing violation, making the pre-May 24, 2022

conduct timely under the continuing violation doctrine.

163.    Mr. Williams was qualified for his position and successfully performed for nearly

25 years, rising from Network Analyst in 1998 to Vice President and Chief Information Officer

in 2006. His promotion to officer was so significant that NMCRS amended its bylaws to permit

it. He delivered twenty consecutive years of clean financial audits, maintained 99.9% network

uptime across global sites, led major technology transformations including the worldwide

deployment of the CAP II system and migration to Microsoft 365, and received commendations

from external national security experts, including Admiral T.J. White's October 2021 praise for his cybersecurity leadership.

164.    NMCRS subjected Mr. Williams to adverse actions because of his race, including systematically stripping his executive authorities, placing him on a fraudulent Performance Improvement Plan in August 2022 after leadership had already begun recruiting for his replacement in July 2022, and terminating him on May 23, 2023, pursuant to a predetermined plan.

165.    Racial animus is evidenced by, inter alia:

(a) The unremedied "crack the whip" remark: On or about June 3, 2022, COO Dawn Cutler, a white officer, stated that "someone needed to crack the whip on [Mr. Williams]"—a racially charged remark carrying explicit connotations when directed at the organization's only Black executive officer. This remark was reported to HR by colleague Gabriella Telles, yet HR took no corrective action. Less than three months later, Mr. Williams was placed on a Performance Improvement Plan;

(b) The "witch hunt" characterization from NMCRS's own counsel: In April 2020, NMCRS's outside counsel formally characterized the campaign against Mr. Williams as a "witch hunt" targeting "one of his colleagues (who happens to be a Black male)" and confirmed that an internal investigation had found "no fraud or financial impropriety by CIO Williams." Despite this formal exoneration, leadership continued to target Mr. Williams;

(c) CEO Klimp's October 15, 2021 praise followed by pretextual PIP: CEO Jack Klimp relayed high praise for Mr. Williams's cybersecurity leadership from

Admiral T.J. White in October 2021, noting that Mr. Williams and his team were "doing exactly what is needed." CEO Klimp also publicly praised Mr. Williams's IT accomplishments in his July 2022 retirement announcement. Despite this documented recognition of exemplary performance, Mr. Williams was placed on a fraudulent PIP approximately ten months later in August 2022, shortly after returning from FMLA-protected leave. This sudden shift from praise to discipline demonstrates pretext and supports an inference of discriminatory motive;

(d) The September 2020 "Soft Approach" memo: White officers circulated an internal draft memo among themselves titled "SOFT APPROACH... TIME TO MOVE ON" that explicitly outlined a premeditated plan to "force" Mr. Williams's resignation while expressly instructing the CEO "(this is not the time to discuss any of his performance issues)." This directive—to avoid discussing performance while orchestrating removal—proves the subsequent performance narrative was manufactured pretext and the true motive was discriminatory;

(e) The March 22, 2023 predetermined directive to "fire Willie": Outgoing CEO Jack Klimp provided incoming CEO Robert Ruark with a dossier and instructed him that the "first thing he needed to do was to fire Willie," referring to Mr. Williams. This directive was given before CEO Ruark had assumed office or independently assessed performance, demonstrating the decision to remove the organization's only Black executive officer was predetermined and racially motivated;

(f) The CAO Estes email revealing racial animus: In a November 1, 2017 email, CAO Kathy Estes framed a deputy personnel decision in explicitly racial and gendered terms, stating: "The optics are not good. We have an older, white male

whose black boss allegedly promised him a position... and then gave the responsibility to an Asian female." This statement reveals discriminatory discomfort with a Black executive officer making personnel decisions and demonstrates the racial animus underlying leadership's campaign against Mr. Williams; and

(g) The "invisible Black officer" incidents: On two separate occasions during officer meetings in 2020-2021, CEO Klimp named and praised each white officer individually while conspicuously skipping over Mr. Williams, the only Black officer, as if he were invisible. When confronted, CEO Klimp became defensive and dismissive, and white officers who witnessed the exclusion remained silent, demonstrating complicity in racial subordination.

166.    Similarly situated white officers were treated more favorably and were not subjected to comparable discipline, PIPs, or replacement recruiting despite failing to complete major assigned strategic deliverables:

(a) CAO Chris Dour failed to implement the mandated standardized officer-evaluation system by year-end 2022, a CEO-priority deliverable, with internal documents confirming "No progress to date." Despite this documented failure of a critical organizational initiative, he faced no PIP, no replacement recruiting, no heightened scrutiny, and no discipline;

(b) CDCO Gillian Gonzalez failed to deliver the FY23 Campaign Plan, a strategic fundraising deliverable documented as "Not Started" in late 2022. Despite this failure to produce a core departmental deliverable, she faced no discipline and

received supportive, developmental coaching, whereas Mr. Williams's "coaching" was punitive and coordinated with leadership to build a termination record; and

(c) COO Dawn Cutler failed to deliver the organization-wide Strategic Business Plan assigned to her role. Despite this failure and despite making the racially charged "crack the whip" remark about Mr. Williams (reported to HR but left unremedied), she faced no discipline, no PIP, and no threat of termination.

167.    NMCRS selectively enforced alleged performance expectations against Mr. Williams, the only Black executive officer, while white officers who failed to complete major strategic deliverables faced no comparable discipline or accountability. An independent Team 360 Review finalized in October 2022 documented organization-wide failures, with the officer cohort receiving a collective "D" grade for team health and failing scores in Communication, Relationships, and Execution—the same categories cited in Mr. Williams's PIP. Yet Mr. Williams was the only officer subjected to a PIP, demonstrating that the stated performance concerns were a pretext for race discrimination.

168.    NMCRS's stated reasons for the adverse actions were false and pretextual. Race was a motivating factor in the adverse actions. The sudden shift from praise (October 2021) to discipline (August 2022), the predetermined removal plan evidenced by the "Soft Approach" memo and "fire Willie" directive, the "witch hunt" acknowledgment by NMCRS's own counsel, the CAO Estes email revealing racial discomfort, and the stark disparate treatment of similarly situated white officers all demonstrate that NMCRS's stated performance concerns were pretextual and race was the true motive. NMCRS manufactured performance critiques through the use of consultants with personal ties to C-suite officers rather than independent, qualified IT assessments. CDCO Gonzalez hired a personal friend to evaluate IT operations despite the

65

consultant's lack of IT expertise, and the resulting critique—generated through this cronyism—was used to justify the PIP against Mr. Williams. Meanwhile, CDCO Gonzalez herself had failed to deliver the CEO-mandated FY23 Campaign Plan but received supportive coaching rather than discipline, demonstrating that performance deficiencies were manufactured selectively against Mr. Williams.

169.    By discriminating against Mr. Williams with respect to his compensation, terms, conditions, and privileges of employment because of his race, NMCRS violated Title VII, 42 U.S.C. § 2000e-2(a).

170.    NMCRS's conduct was undertaken with malice or reckless indifference to Mr. Williams's federally protected rights. The deliberate coordination among multiple C-suite officers, the predetermined removal plan, and the exploitation of his medical vulnerabilities demonstrate willful discrimination.

171.    As a direct and proximate result of NMCRS's unlawful conduct, Mr. Williams has suffered and continues to suffer significant damages, including lost wages, lost benefits (including pension benefits lost by termination before his June 28, 2023 25-year service anniversary), emotional distress, reputational harm, and other compensatory damages.

172.    Mr. Williams is entitled to compensatory and punitive damages, subject to the statutory cap of $300,000 for employers with more than 500 employees under 42 U.S.C. § 1981a(b)(3)(D).

### COUNT FOUR
### HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
**(against Navy-Marine Corps Relief Society)**

173.    Mr. Williams incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

174.    Mr. Williams is Black and was the first and only Black executive officer in NMCRS's 119-year history.

175.    He timely filed an EEOC charge on March 18, 2024, alleging race discrimination, hostile work environment, and retaliation. On June 18, 2025, the EEOC issued a Notice of Right to Sue, which Mr. Williams received on July 17, 2025. This action was filed within ninety days of receipt.

176.    The racially hostile conduct occurring before May 24, 2022 (300 days before the March 18, 2024 EEOC charge) is part of the same unlawful employment practice that continued through Mr. Williams's May 23, 2023 termination and beyond. The hostile environment began years earlier with racially derogatory comments by former COO Pete Collins and continued without remediation through multiple leadership changes. The acts described constitute a continuing violation, making the pre-May 24, 2022 conduct timely under the continuing violation doctrine.

177.    Mr. Williams was subjected to unwelcome conduct because of his race, including but not limited to:

(a) On or about June 3, 2022, COO Cutler's racially charged remark: COO Dawn Cutler, a white officer, stated that someone needed to "crack the whip" on Mr. Williams—a racially charged remark carrying explicit connotations when directed at the only Black officer in the organization. This remark was reported to HR by colleague Gabriella Telles, yet HR took no corrective action despite NMCRS's stated No Tolerance Policy;

(b) Racially derogatory characterization by former white officer: Former COO Pete Collins, a white officer, referred to Mr. Williams's IT department as being run by

"a black, an Asian, and a Jew," explicitly targeting employees based on their race, ethnicity, and religion. This derogatory characterization was part of a broader pattern of racist comments that led to Collins's termination in February 2020 after multiple employees filed complaints;

(c) Pattern of targeting Black employees: COO Cutler also directed hostile conduct toward another Black female employee, Thelisha Woods, including threatening termination and publicly screaming at Ms. Woods and Jodi Briggs (Asian female IT Director) during meetings while treating white colleagues gently. Multiple individuals complained, yet HR took no corrective action. This concurrent targeting of multiple minority employees while white officers faced no discipline demonstrated racial animus;

(d) "Witch hunt" acknowledgment by NMCRS's own counsel: In April 2020, NMCRS's outside counsel formally documented that the investigation of Mr. Williams appeared to be a "witch hunt" targeting "one of his colleagues (who happens to be a Black male)," while confirming "no fraud or financial impropriety by CIO Williams." Despite this acknowledgment that the campaign was racially motivated and baseless, NMCRS leadership continued the hostile conduct;

(e) Systematic exclusion and disempowerment after protected complaints: Following Mr. Williams's July 17, 2019 formal complaint to the Board detailing racist comments, white officers engaged in a coordinated campaign including removing him from the signature authority list (while all white officers retained theirs), stripping his hiring authority, excluding him from key meetings, attempting to

amend bylaws to remove him from succession based on his non-military status, denying him appropriate office space while white officers received executive offices, and publicly excluding him from team recognition as the "invisible Black officer" during CEO Klimp's praise sessions where each white officer was named individually while Mr. Williams was skipped;

(f) Fraudulent Performance Improvement Plan as racial harassment: Placement on a PIP in August 2022 after leadership had already begun recruiting for his replacement in July 2022—more than a month before the PIP was issued—while similarly situated white officers who failed to complete major strategic deliverables faced no discipline. The pretextual nature demonstrates it was part of the racially hostile campaign;

(g) Predetermined removal directive: In March 2023, the outgoing CEO told the incoming CEO that his "first task" was "to fire Willie," demonstrating that the decision to remove the organization's only Black executive officer was predetermined, further evidencing that the hostile environment was designed to achieve his removal based on race; and

(h) Multi-year pattern of purging minorities: The hostile environment extended to include systematic elimination of multiple Black and minority employees over six years (2018-2024), demonstrating institutional racial hostility.

178.    The foregoing conduct was because of race and was severe or pervasive. It spanned multiple years, involved multiple senior officers including the CEO and COO, included explicitly racially charged and bigoted language ("crack the whip," "a black, an Asian, and a Jew"), systematic exclusion from core leadership functions, public dehumanization (the

"invisible Black officer" incidents), manufactured discipline through a fraudulent PIP, and culminated in tangible employment actions (the PIP and termination). The pattern was designed to isolate, disempower, and ultimately remove Mr. Williams because of his race.

179.    The hostile environment was both subjectively and objectively hostile. A reasonable person in Mr. Williams's position—as the only Black executive officer facing coordinated racial harassment from multiple C-suite officers, explicit racially charged remarks left unremedied by HR, systematic stripping of executive authorities, public exclusion and dehumanization, and a predetermined plan for removal—would find this environment abusive, hostile, and intimidating. Mr. Williams experienced it as such and complained formally to the Board in July 2019, to the CEO multiple times, and ultimately to the EEOC. The stress from the hostile environment directly contributed to his cardiac events in January 2018 and May 2023, with his treating cardiologist documenting that occupational stress was a significant contributing factor.

180.    Similarly situated white officers were not subjected to comparable hostility or discipline:

(a) CAO Chris Dour failed to make any progress on the mandated standardized officer-evaluation system, with internal documents confirming "No progress to date" as of late 2022, yet received no PIP or discipline. Instead, he actively participated in the hostile campaign against Mr. Williams, co-authoring the "Soft Approach" memo and recruiting for Mr. Williams's replacement;

(b) CFO Carolyn Bauer was involved in a phishing/wire-transfer incident resulting in financial loss. When Mr. Williams properly reported it, leadership responded with

hostility toward him rather than addressing the security failure. CFO Bauer faced no discipline or heightened scrutiny;

(c) CDCO Gillian Gonzalez failed to deliver the FY23 Campaign Plan, documented as "Not Started" in late 2022. She received supportive, developmental coaching, while Mr. Williams's "coaching" was punitive and used to build a removal record; and

(d) COO Dawn Cutler—the same officer who made the "crack the whip" remark—failed to deliver the Strategic Business Plan yet faced no discipline despite creating a racially hostile environment.

181.    The hostile work environment is imputable to NMCRS. The harassment was perpetrated by supervisors and C-suite leadership, including the COO and CEO. NMCRS knew of the harassment through multiple channels—HR received complaints about the "crack the whip" remark and threats to Black employees; the Board received Mr. Williams's July 2019 formal complaint; and NMCRS's own legal counsel documented the "witch hunt" in April 2020—yet NMCRS condoned the conduct and failed to take prompt remedial action. Instead, the hostile conduct escalated, culminating in tangible employment actions (the fraudulent PIP and termination).

182.    The pattern of race-based hostility extended beyond Mr. Williams's termination. In November 2024, NMCRS conducted a Reduction in Force eliminating only minority employees—Director Thelisha Woods (Black female), Gabriella Telles (Hispanic female), and Richard Von Zimmer (gay, mixed-race)—while protecting recently hired white employees. HR Director Tracy Brownstein admitted to Ms. Woods that she was being terminated because she

"listened to Willie too much," demonstrating that the racial animus extended to other minorities associated with Mr. Williams.

183.    By subjecting Mr. Williams to a racially hostile work environment, NMCRS violated Title VII, 42 U.S.C. § 2000e-2(a).

184.    NMCRS's conduct was undertaken with malice or reckless indifference to Mr. Williams's federally protected rights. The deliberate coordination among C-suite officers, the "Soft Approach" memo, the "fire Willie" directive, and the failure to remedy known harassment despite multiple complaints demonstrate willful misconduct.

185.    As a direct and proximate result of NMCRS's unlawful conduct, Mr. Williams has suffered and continues to suffer significant damages, including lost wages, lost benefits, emotional distress, reputational harm, and other compensatory damages. The racially hostile environment contributed to stress-induced cardiac events requiring emergency medical intervention.

186.    Mr. Williams is entitled to compensatory and punitive damages, subject to the statutory cap of $300,000 for employers with more than 500 employees under 42 U.S.C. § 1981a(b)(3)(D).

**COUNT FIVE**
**DISCRIMINATION IN VIOLATION OF THE**
**AMERICANS WITH DISABILITIES ACT**
**(against Navy-Marine Corps Relief Society)**

187.    Mr. Williams incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

188.    Mr. Williams has one or more disabilities within the meaning of 42 U.S.C. § 12102(1), including Stage 3 chronic kidney disease, severe hypertension, vertigo, and a cardiac

impairment. His cardiac impairment required emergency quadruple bypass surgery in January 2018 following a stress-induced heart attack and resulted in a second cardiac event (NSTEMI) on May 4, 2023, requiring hospitalization, ongoing cardiac rehabilitation, and significant medical restrictions. These impairments substantially limited one or more major life activities, including the functions of the cardiovascular system, kidney system, neurological functions, and his ability to work.

189.    Alternatively, NMCRS regarded Mr. Williams as having an impairment under 42 U.S.C. § 12102(3). NMCRS was aware of his cardiac history (including the 2018 quadruple bypass surgery), his Stage 3 chronic kidney disease, his severe hypertension, and his vertigo. NMCRS observed medical symptoms, including slurred speech noted by CEO Robert Ruark in February 2023 and again around May 3-4, 2023. Despite this knowledge of Mr. Williams's serious health conditions, NMCRS proceeded to terminate him during his cardiac recovery.

190.    Mr. Williams was a qualified individual with a disability under 42 U.S.C. § 12111(8). Throughout his 25-year tenure as Vice President and Chief Information Officer, he successfully performed the essential functions of the role, as evidenced by twenty consecutive years of clean financial audits, 99.9% network uptime across global sites, successful completion of major technology transformations, and commendations from external experts including Admiral T.J. White's October 2021 praise for his cybersecurity leadership. With reasonable accommodation in the form of finite medical leave and short-term timing adjustments following his May 4, 2023 cardiac event, Mr. Williams could continue to perform the essential functions of his position.

191.    Mr. Williams requested reasonable accommodations, including:

(a) May 16, 2023 (verbal request): Mr. Williams verbally notified Chief Administrative Officer Chris Dour and Chief Financial Officer Carolyn Bauer that he needed to initiate FMLA leave and short-term disability to begin physician-directed cardiac rehabilitation following his May 4, 2023 cardiac event. He was told they would "talk about it later";

(b) May 22, 2023 (written request): Mr. Williams submitted a formal written request for FMLA leave and short-term disability accommodations to NMCRS leadership and Human Resources, including an attached schedule showing his cardiac rehabilitation appointments. This request was accompanied by medical documentation of his serious health condition requiring ongoing treatment; and

(c) June 2023 (timing accommodations): Following his termination, Mr. Williams requested short extensions of time to review complex employment separation documents due to vertigo and cognitive difficulties caused by his cardiac condition. His wife communicated to leadership that he was under doctor's orders with restricted electronics use and was medically unable to make decisions requiring sustained concentration. These requests were documented to CAO Dour and CEO Ruark but were ignored, with CEO Ruark instead pressuring Mr. Williams on June 7, 2023 to "make a decision today" despite knowing he was medically incapacitated.

192.    NMCRS failed to engage in the interactive process required by the ADA and refused to provide reasonable accommodations. Instead of processing Mr. Williams's accommodation requests or engaging in good-faith dialogue about his medical needs, NMCRS issued a termination ultimatum on May 23, 2023—one day after his written accommodation

request and less than three weeks after his cardiac event. NMCRS never provided any FMLA paperwork, never engaged in any discussion about what accommodations might be reasonable, and never attempted to determine whether Mr. Williams could return to work with accommodations after completing his physician-ordered cardiac rehabilitation.

193.    The accommodations sought—finite medical leave for cardiac rehabilitation and short-term timing adjustments for reviewing complex documents while cognitively impaired—were reasonable, would not have imposed an undue hardship on NMCRS, and were consistent with NMCRS's existing leave programs and past practices of providing medical leave to other officers.

194.    NMCRS discriminated against Mr. Williams because of his disability under 42 U.S.C. § 12112(a) by:

(a) Terminating him during medical crisis: Terminating him on May 23, 2023—just nineteen days after his May 4, 2023 cardiac event requiring hospitalization and one day after his formal written accommodation request for cardiac rehabilitation leave—demonstrating NMCRS exploited his medical vulnerability as an opportunity to remove him;

(b) Refusing interactive process: Refusing to engage in the interactive process required by the ADA, including failing to discuss what accommodations might enable him to return to work after completing physician-directed cardiac rehabilitation, and failing to provide any FMLA paperwork despite his written request with supporting medical documentation;

(c) Pressuring during medical incapacity: Pressuring him on June 7, 2023 to immediately decide on separation terms and sign a general release despite being

on notice from his wife that he was under doctor's orders with restricted electronics use, suffering from vertigo and cognitive impairment, and medically unable to make complex decisions. CEO Ruark stated "I need it today. We've been waiting a long time, Willie," despite knowing Mr. Williams was medically incapacitated;

(d) Denying medical leave accommodation: Failing to provide the reasonable accommodation of medical leave that would have allowed Mr. Williams to complete his physician-directed cardiac rehabilitation and return to performing the essential functions of his position; and

(e) Pattern of exploiting medical vulnerabilities: Systematically exploiting Mr. Williams's medical vulnerabilities as opportunities for adverse action throughout his employment, demonstrating a deliberate pattern of disability discrimination.

195.    NMCRS exploited Mr. Williams's medical vulnerabilities as opportunities for adverse action on multiple occasions, demonstrating a deliberate pattern of disability discrimination:

(a) 2018: IT assessment during cardiac recovery: While Mr. Williams recovered from emergency quadruple bypass surgery in 2018, NMCRS conducted an IT assessment by Harvard Partners, deliberately excluding him from participation during his medical leave. NMCRS later used this assessment—conducted while he was recovering from major cardiac surgery—as a basis for discipline in the August 2022 PIP, despite CEO Klimp subsequently acknowledging the report was a "hit job";

(b) April 2022: Audit during family death: In April 2022, while Mr. Williams was dealing with the sudden death of his younger brother's wife, NMCRS commissioned another IT audit (Defense Cyber Security Group). Despite his notification of this profound personal crisis, NMCRS deliberately excluded him from defining the scope of work and proceeded with the audit without his input. NMCRS later used this audit as a primary basis for the August 2022 PIP;

(c) May 2023: Termination during cardiac rehabilitation: In May 2023, NMCRS terminated Mr. Williams nineteen days after his cardiac event and one day after he requested medical leave for cardiac rehabilitation. The extreme stress of the termination ultimatum caused Mr. Williams to suffer syncope (loss of consciousness) and collapse during his first cardiac rehabilitation session on May 24, 2023—the day after the termination—requiring re-hospitalization. Medical providers attributed this event to acute stress caused by the termination.

196.    This pattern demonstrates that NMCRS deliberately targeted times when Mr. Williams was most vulnerable due to serious medical conditions or personal crises to take adverse actions, knowing these actions would cause additional medical harm while he was least able to defend himself.

197.    NMCRS's conduct was undertaken with reckless indifference to Mr. Williams's federally protected rights under the ADA. Senior management, including CEO Robert Ruark and CAO Chris Dour, had actual knowledge of Mr. Williams's serious cardiac condition, his physician-directed need for cardiac rehabilitation, and his medical restrictions, yet proceeded to terminate him during his recovery and pressured him to make complex legal decisions while he

was medically incapacitated. The pattern of exploiting his medical vulnerabilities demonstrates willful discrimination.

198.    As a direct and proximate result of NMCRS's unlawful conduct, Mr. Williams has suffered and continues to suffer significant damages, including lost wages, lost benefits (including health insurance during his cardiac recovery), emotional distress, exacerbation of his medical conditions, reputational harm, and other compensatory damages. NMCRS's termination during his medical crisis caused immediate physical harm, as evidenced by his syncope and collapse during rehabilitation the day after the termination.

199.    Mr. Williams is entitled to compensatory and punitive damages under the ADA, subject to the statutory cap of $300,000 for employers with more than 500 employees under 42 U.S.C. § 1981a(b)(3)(D).

200.    Additionally, Mr. Williams is entitled to equitable relief, including reinstatement or front pay, as appropriate.

**COUNT SIX**
**INTERFERENCE WITH AND RETALIATION FOR EXERCISE OF RIGHTS**
**IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT**
**(against Navy-Marine Corps Relief Society)**

201.    Mr. Williams incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

202.    Mr. Williams was an eligible employee under the FMLA, having been employed by NMCRS for nearly 25 years and having worked well in excess of 1,250 hours during the 12 months preceding his need for FMLA leave. NMCRS is a covered employer under the FMLA.

203.    Mr. Williams suffered a "serious health condition" within the meaning of 29 U.S.C. § 2611(11) on May 4, 2023. He suffered a cardiac event (NSTEMI) requiring inpatient hospital care and continuing treatment by a health care provider, including enrollment in and

completion of physician-directed cardiac rehabilitation. His treating cardiologist documented that the cardiac event was significant, required immediate medical intervention, and necessitated ongoing cardiac rehabilitation to prevent further cardiovascular complications.

204.    Mr. Williams provided sufficient notice of his need for FMLA leave:

(a) May 16, 2023 (verbal notice): Mr. Williams verbally notified Chief Administrative Officer Chris Dour and Chief Financial Officer Carolyn Bauer—senior NMCRS officers with authority over leave matters—that he needed to initiate FMLA leave and short-term disability to begin physician-directed cardiac rehabilitation following his May 4, 2023 cardiac event. He explained the serious nature of his condition and his physician's directive to begin rehabilitation. The officers told him they would "talk about it later," deferring any discussion of his leave request; and

(b) May 22, 2023 (written notice): Mr. Williams submitted a formal written request for FMLA leave and short-term disability accommodations to NMCRS leadership and Human Resources, including an attached schedule showing his cardiac rehabilitation appointments beginning May 24, 2023. This written request provided NMCRS with specific information about the nature of his condition, the need for leave, the anticipated duration, and the planned start date of treatment.

205.    NMCRS failed to provide the required FMLA eligibility, rights, or designation notices as mandated by 29 C.F.R. § 825.300. Despite Mr. Williams's verbal notice on May 16, 2023 and written notice with supporting documentation on May 22, 2023, NMCRS never:

(a) Provided written notice of his FMLA eligibility and rights;

(b) Requested additional medical certification or information;

(c)  Designated the requested leave as FMLA-qualifying or non-qualifying;

(d)  Engaged in any dialogue about the leave request; or

(e)  Provided any FMLA-related paperwork whatsoever.

206.    Instead, NMCRS terminated him the day after his written leave request, demonstrating a complete refusal to honor his FMLA rights.

**FMLA Interference**

207.    By dismissing Mr. Williams's May 16, 2023 verbal request with "we'll talk about it later," refusing to process his May 22, 2023 written request, failing to provide any FMLA benefits, rights, or designation notices as required by federal regulation, terminating him on May 23, 2023—one day after his written request—cutting off his health benefits, and coercing a "retirement" rather than restoring him to his position or providing leave, NMCRS interfered with, restrained, and denied the exercise of rights provided by the FMLA in violation of 29 U.S.C. § 2615(a)(1).

208.    NMCRS's interference was willful and not in good faith. The close temporal proximity between Mr. Williams's written FMLA request (May 22, 2023) and his termination (May 23, 2023), combined with NMCRS's complete failure to provide any FMLA paperwork, process the request, or engage in any dialogue about his leave needs, demonstrates that NMCRS had no intention of honoring his statutory rights. The interference was immediate, deliberate, and designed to prevent Mr. Williams from exercising his FMLA rights.

209.    The interference caused immediate and severe harm. On May 24, 2023—the day after the termination ultimatum and Mr. Williams's scheduled first day of cardiac rehabilitation—he suffered syncope (loss of consciousness) and collapsed during the rehabilitation session, requiring re-hospitalization. Medical providers attributed this event to

acute stress exacerbated by NMCRS's termination. NMCRS's interference thus not only denied Mr. Williams his statutory right to medical leave but also directly caused additional medical harm by creating extreme stress during his cardiac recovery.

**FMLA Retaliation**

210.     NMCRS terminated Mr. Williams (or constructively discharged him through the coercive "retire or be fired" ultimatum) because he requested FMLA leave, in violation of 29 U.S.C. § 2615(a)(2).

211.     Mr. Williams engaged in protected activity under the FMLA by:

(a) Verbally requesting FMLA leave on May 16, 2023, providing notice of his serious health condition and need for physician-directed cardiac rehabilitation; and

(b) Submitting a formal written request for FMLA leave and short-term disability on May 22, 2023, accompanied by his cardiac rehabilitation schedule and medical documentation

212.     NMCRS subjected Mr. Williams to an adverse employment action—termination via an ultimatum to "retire" by June 30, 2023 or be terminated effective June 2, 2023—on May 23, 2023, one day after his written FMLA request.

213.     The one-day temporal proximity between Mr. Williams's written FMLA request and his termination is direct evidence of retaliatory intent and establishes a prima facie case of FMLA retaliation. This temporal proximity is supported by:

(a) Pattern of exploiting medical crises: NMCRS's documented history of taking adverse actions during Mr. Williams's medical crises, including conducting IT assessments while he recovered from quadruple bypass surgery in 2018 and from a family death in April 2022, and using those assessments as bases for discipline;

(b) Predetermined termination plan: The March 2023 directive from outgoing CEO Jack Klimp to incoming CEO Robert Ruark that the "first thing he needed to do was to fire Willie" demonstrates the decision to terminate Mr. Williams was predetermined. NMCRS exploited his medical vulnerability—his need for cardiac rehabilitation following a serious cardiac event—as the opportune moment to execute this predetermined plan;

(c) Documented discriminatory animus: The "witch hunt" acknowledgment by NMCRS's own counsel in April 2020, the "crack the whip" remark by COO Cutler in June 2022, the September 2020 "Soft Approach" memo outlining a plan to force his resignation, and the systematic disparate treatment of Mr. Williams compared to white officers who faced no discipline, all support an inference that NMCRS terminated Mr. Williams in retaliation for exercising his FMLA rights and because of his race and disability; and

(d) Complete failure to process FMLA request: NMCRS's failure to provide any FMLA paperwork, engage in any dialogue, or make any attempt to accommodate the leave request demonstrates that the termination was a deliberate response to his FMLA request rather than a coincidental personnel decision.

214.    NMCRS's FMLA violations were willful within the meaning of 29 U.S.C. § 2617(a)(1)(A)(iii). NMCRS leadership—including CEO Robert Ruark, CAO Chris Dour, and CFO Carolyn Bauer—had actual knowledge of Mr. Williams's serious health condition (cardiac event requiring hospitalization and rehabilitation), his verbal FMLA request on May 16, 2023, and his written FMLA request with supporting medical documentation on May 22, 2023. Despite this actual knowledge, NMCRS terminated him the very next day without providing any FMLA

benefits, notices, or leave, and without making any attempt to process his request. This conduct was not in good faith and demonstrates reckless disregard for Mr. Williams's FMLA rights. The willfulness is further evidenced by NMCRS's pattern of exploiting Mr. Williams's medical vulnerabilities as opportunities for adverse action throughout his employment.

215.    Because NMCRS's violations were willful, Mr. Williams is entitled to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii).

216.    As a direct and proximate result of NMCRS's unlawful conduct, Mr. Williams has suffered and continues to suffer significant damages, including:

(a) Lost wages from May 23, 2023 forward;

(b) Lost benefits, including health insurance coverage during his cardiac recovery (NMCRS conditioned COBRA premium payment on signing a general release, and when he declined, his active health insurance ended on June 30, 2023, leaving him without coverage during critical cardiac rehabilitation);

(c) Lost pension benefits due to termination before his June 28, 2023 25-year service anniversary;

(d) Emotional distress and severe anxiety caused by losing his livelihood and health coverage during a medical crisis;

(e) Physical harm, including the syncope event and re-hospitalization on May 24, 2023, directly caused by the stress of the termination; and

(f) Reputational harm from the false public announcement that he had "retired."

217.    Mr. Williams is entitled to an amount equal to any wages, salary, employment benefits, or other compensation denied or lost as a result of NMCRS's violations, plus interest, pursuant to 29 U.S.C. § 2617(a)(1)(A)(i).

218.    Mr. Williams is entitled to liquidated damages equal to the sum of the amounts described in paragraph 203, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), due to NMCRS's willful violations.

219.    Mr. Williams is entitled to equitable relief, including reinstatement or front pay, as appropriate, pursuant to 29 U.S.C. § 2617(a)(1)(B).

220.    Mr. Williams is entitled to reasonable attorney's fees and costs pursuant to 29 U.S.C. § 2617(a)(3).

## COUNT SEVEN
## DISCRIMINATION ON THE BASIS OF RACE
### In Violation of the Virginia Human Rights Act
### (against Navy-Marine Corps Relief Society)

221.    Mr. Williams incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

222.    The Virginia Human Rights Act (VHRA), Va. Code § 2.2-3900 et seq., prohibits race discrimination in employment.

223.    Mr. Williams is Black and was the only Black C-suite officer in NMCRS's 119-year history. He performed successfully for nearly 25 years, rising from Network Analyst in 1998 to Vice President and Chief Information Officer in 2006. His promotion to officer was so significant that NMCRS amended its bylaws to permit it, with the change championed by the Board of Directors under the leadership of former Chairman of the Joint Chiefs of Staff Admiral Michael Mullen. Mr. Williams delivered twenty consecutive years of clean financial audits, maintained 99.9% network uptime across global sites, led multiple organization-wide technology transformations, and received commendations from external national security experts.

224.    NMCRS discriminated against Mr. Williams because of his race, as evidenced by:

(a) The unremedied "crack the whip" remark: On or about June 3, 2022, COO Dawn Cutler, a white officer, stated that "someone needed to crack the whip on [Mr. Williams]"—a racially charged remark carrying explicit connotations when directed at the organization's only Black executive officer. This remark was reported to HR by colleague Gabriella Telles, yet HR took no corrective action. Less than three months later, Mr. Williams was placed on a Performance Improvement Plan;

(b) NMCRS's own counsel acknowledging a "witch hunt": In April 2020, NMCRS's outside counsel formally characterized the campaign against Mr. Williams as a "witch hunt" targeting "one of his colleagues (who happens to be a Black male)" and confirmed that an internal investigation had found "no fraud or financial impropriety by CIO Williams." Despite this formal exoneration, leadership continued to target Mr. Williams;

(c) CEO Klimp's October 15, 2021 praise followed by pretextual PIP: CEO Jack Klimp relayed high praise for Mr. Williams's cybersecurity leadership from Admiral T.J. White in October 2021, noting that Mr. Williams and his team were "doing exactly what is needed." CEO Klimp also publicly praised Mr. Williams's IT accomplishments in his July 2022 retirement announcement. Despite this documented recognition of exemplary performance, Mr. Williams was placed on a fraudulent PIP just ten months later in August 2022, shortly after returning from FMLA-protected leave. This sudden shift from praise to discipline demonstrates pretext and supports an inference of discriminatory motive;

(d) The September 2020 "Soft Approach" memo: White officers circulated an internal draft memo among themselves titled "SOFT APPROACH... TIME TO MOVE ON" that explicitly outlined a premeditated plan to "force" Mr. Williams's resignation while expressly instructing the CEO "(this is not the time to discuss any of his performance issues)." This directive—to avoid discussing performance while orchestrating removal—proves the subsequent performance narrative was manufactured pretext designed to mask racial animus;

(e) The March 2023 predetermined directive to "fire Willie": Outgoing CEO Jack Klimp provided incoming CEO Robert Ruark with a dossier and instructed him that the "first thing he needed to do was to fire Willie," referring to Mr. Williams. This directive was given before CEO Ruark had assumed office or independently assessed performance, demonstrating the decision to remove the organization's only Black executive officer was predetermined and racially motivated;

(f) The pretextual PIP and termination while recruiting replacement: NMCRS placed Mr. Williams on a PIP in August 2022 after leadership had already begun actively recruiting for his replacement in July 2022—more than a month before the PIP was issued. NMCRS publicly posted his position on September 25, 2022 while he was supposedly undergoing "coaching," and terminated him on May 23, 2023 pursuant to the predetermined plan, demonstrating the entire disciplinary process was pretextual;

(g) The CAO Estes email revealing racial animus: In a November 1, 2017 email, CAO Kathy Estes framed a deputy personnel decision in explicitly racial and gendered terms, stating: "The optics are not good. We have an older, white male

whose black boss allegedly promised him a position... and then gave the responsibility to an Asian female." This reveals discriminatory discomfort with a Black executive officer making personnel decisions and demonstrates the racial animus underlying leadership's campaign; and

(h) The "invisible Black officer" incidents: On two separate occasions, CEO Klimp named and praised each white officer individually while conspicuously skipping over Mr. Williams as if he were invisible, demonstrating public racial subordination and dehumanization.

225.    Similarly situated white officers were treated more favorably and faced no discipline for failing to complete major assigned strategic deliverables:

(a) CAO Chris Dour failed to implement the mandated standardized officer-evaluation system by year-end 2022, a CEO-priority deliverable, with internal documents confirming "No progress to date." Despite this documented failure of a critical organizational initiative affecting the entire officer cohort, he faced no PIP, no replacement recruiting, no heightened scrutiny, and no discipline. Instead, he actively participated in the campaign against Mr. Williams, co-authoring the "Soft Approach" memo and recruiting for Mr. Williams's replacement;

(b) CDCO Gillian Gonzalez failed to deliver the FY23 Campaign Plan, a strategic fundraising deliverable documented as "Not Started" in late 2022. Despite this failure to produce a core departmental deliverable, she faced no discipline and received supportive, developmental coaching designed to help her succeed, whereas Mr. Williams's "coaching" was punitive, coordinated with leadership to document him for termination, and included the coach instructing him to "stop

documenting things"—a directive designed to suppress evidence of the hostile environment; and

(c) COO Dawn Cutler failed to deliver the organization-wide Strategic Business Plan assigned to her role. Despite this failure and despite making the racially charged "crack the whip" remark about Mr. Williams (reported to HR but left unremedied), she faced no discipline, no PIP, no heightened scrutiny, and no threat of termination. She remained in good standing and continued to participate in the campaign to remove Mr. Williams.

226. NMCRS selectively enforced alleged performance expectations against Mr. Williams, the only Black executive officer, while white officers who failed to complete major strategic deliverables faced no comparable discipline or accountability. An independent Team 360 Review finalized in October 2022 documented organization-wide failures affecting the entire executive leadership team, with the officer cohort receiving a collective "D" grade for team health and failing scores in Communication, Relationships, and Execution—the same categories cited in Mr. Williams's PIP. Yet Mr. Williams was the only officer subjected to a PIP, heightened scrutiny, or replacement recruiting, demonstrating that NMCRS did not apply comparable accountability standards across its executive leadership team.

227. NMCRS's stated reasons for Mr. Williams's discipline and termination were pretextual. Race was a motivating factor in the adverse actions taken against him. The sudden shift from documented praise to manufactured discipline, the predetermined removal plan evidenced by the "Soft Approach" memo and "fire Willie" directive, the "witch hunt" acknowledgment by NMCRS's own counsel, the CAO Estes email revealing racial discomfort

with Black authority, and the stark disparate treatment compared to white officers all demonstrate that the stated performance concerns were false and race was the true motive.

228.    By discriminating against Mr. Williams with respect to his compensation, terms, conditions, and privileges of employment because of his race, NMCRS violated the Virginia Human Rights Act.

229.    NMCRS acted with malice or with willful and wanton disregard for Mr. Williams's rights under Virginia law. The deliberate coordination among multiple C-suite officers to execute a predetermined plan to remove the organization's only Black executive officer, the manufacture of pretextual performance concerns while white officers faced no accountability, the exploitation of his medical vulnerabilities, and the continuation of discriminatory conduct despite formal acknowledgment by NMCRS's own legal counsel that the campaign was a racially motivated "witch hunt," all demonstrate willful misconduct deserving of punitive damages.

230.    As a direct and proximate result, Mr. Williams has suffered damages, including lost income, lost benefits (including pension benefits lost by termination before his June 28, 2023 25-year service anniversary), humiliation, emotional distress, and reputational harm. The discrimination contributed to stress-induced cardiac events requiring emergency medical intervention and ongoing treatment.

231.    Mr. Williams is entitled to compensatory and punitive damages under the VHRA. The VHRA has no statutory cap on punitive damages, allowing full recovery commensurate with the egregious nature of NMCRS's discriminatory conduct.

**COUNT EIGHT**
**HOSTILE WORK ENVIRONMENT ON THE BASIS OF RACE**
**In Violation of the Virginia Human Rights Act**
**(against Navy-Marine Corps Relief Society)**

232.    Mr. Williams incorporates by reference all preceding paragraphs of this

Complaint as if fully set forth herein.

233.    The VHRA prohibits maintaining a racially hostile work environment.

234.    Mr. Williams is Black and was the first and only Black executive officer in

NMCRS's 119-year history. NMCRS subjected him to a racially hostile work environment that

was severe or pervasive.

235.    The race-based hostility began years earlier and continued without remediation

through Mr. Williams's separation and beyond. The hostile environment included:

(a) Removing him in January 2020 from the signature authority list he had held since

2006, while all white officers retained their authority;

(ii) Stripping his 15-year hiring authority in June-July 2020 after he protested

unethical treatment of a new IT hire;

(iii) Excluding him from key meetings concerning the pension plan freeze despite

being the only vested officer;

(iv) Attempting to amend bylaws in October 2020 to remove him from the line of

succession based on an arbitrary military service requirement designed to

uniquely disqualify him;

(v) Denying him office space commensurate with his executive role while white

officers received appropriate offices; and

(vi) Publicly excluding him from team recognition in officer meetings where CEO

Klimp individually named and praised each white officer while skipping over Mr.

Williams as if he were invisible—conduct that occurred on two separate occasions, demonstrating public racial subordination and dehumanization;

(b) Heightened scrutiny not applied to white officers: Mr. Williams was subjected to manufactured performance criticism, a fraudulent PIP, and active recruitment of his replacement, while similarly situated white officers who failed to complete major strategic deliverables received no comparable scrutiny or discipline. An independent Team 360 Review documented organization-wide failures with the officer cohort receiving failing grades, yet only Mr. Williams faced discipline, demonstrating racially discriminatory application of performance standards;

(c) The predetermined "fire Willie" directive: In March 2023, outgoing CEO Jack Klimp instructed incoming CEO Robert Ruark that the "first thing he needed to do was to fire Willie," referring to Mr. Williams. This directive—to remove the organization's only Black executive officer as the new CEO's first priority before he had even assumed office—demonstrates that the hostile environment was designed to achieve Mr. Williams's removal based on race; and

(d) Multi-year pattern of purging Black and minority employees: The hostile environment extended to include systematic elimination of multiple Black and minority employees over six years (2018-2024), including Nicole Hillary, Sylvia Adams, Tsui Ti Lui, and the November 2024 RIF that eliminated only minorities, demonstrating institutional racial hostility.

236.    The hostile environment is imputable to NMCRS because it was perpetrated and ratified by supervisors and C-suite leadership, including the CEO, COO, and CAO. NMCRS had actual knowledge of the harassment through multiple channels:

(a) HR received complaints about the "crack the whip" remark and the threats to Black employees;

(b) The Board of Directors received Mr. Williams's formal July 2019 complaint detailing racist comments and a toxic environment;

(c) NMCRS's own legal counsel documented the "witch hunt" in April 2020; and

(d) The September 2020 "Soft Approach" memo, circulated among white officers and leadership, explicitly outlined a plan to force Mr. Williams's resignation.

237.    Despite this actual knowledge from multiple sources, NMCRS failed to take remedial action. Instead, the hostile conduct escalated, culminating in tangible employment actions (the fraudulent PIP and termination).

238.    The race-based hostility extended beyond Mr. Williams's May 23, 2023 termination, demonstrating the pervasive and continuing nature of the racially hostile environment. In November 2024, NMCRS conducted a Reduction in Force that eliminated only minority employees—Director Thelisha Woods (Black female), Gabriella Telles (Hispanic female), and Richard Von Zimmer (gay, mixed-race)—while protecting recently hired white employees. HR Director Tracy Brownstein admitted to Ms. Woods that she was being terminated because she "listened to Willie too much," and upon information and belief, COO Dawn Cutler similarly stated Woods was "too tied to Willie," demonstrating that the racial animus against Mr. Williams extended to other minority employees associated with him and that the hostile environment persisted even after his separation.

239.    This claim is timely under the continuing-violation doctrine. The hostile environment began no later than the racist comments by COO Collins (who was terminated in February 2020 for such conduct) and continued through Mr. Williams's May 23, 2023

termination and the November 2024 Reduction in Force targeting minorities. The continuing

nature of the violation brings all acts within the actionable period.

240.    As a direct and proximate result, Mr. Williams has suffered damages, including

lost income, lost benefits (including pension benefits lost by termination before his June 28, 2023

25-year service anniversary), humiliation, emotional distress, and reputational harm. The racially

hostile environment directly contributed to the extreme occupational stress that caused his

cardiac events in January 2018 and May 2023, with his treating cardiologist documenting that

occupational stress was a significant contributing factor to both events. The hostile environment

also contributed to his need for psychiatric treatment for PTSD symptoms, anxiety, and sleep

disturbance, and precipitated a mental health crisis in July 2023 requiring police intervention.

241.    Due to the conscious disregard for Mr. Williams's rights, the deliberate

coordination among multiple C-suite officers to maintain and escalate the hostile environment

despite actual knowledge of its racial motivation (including NMCRS's own counsel's "witch

hunt" characterization), the failure to remedy known harassment, and the severity of NMCRS's

conduct spanning multiple years and culminating in termination during a medical crisis, Mr.

Williams is entitled to punitive damages under the VHRA. The VHRA has no statutory cap on

punitive damages, allowing full recovery commensurate with the egregious nature of the

misconduct.

## COUNT NINE
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (against Navy-Marine Corps Relief Society)

242.    Mr. Williams incorporates by reference all preceding paragraphs of this

Complaint as if fully set forth herein.

243.    He timely filed an EEOC charge on March 18, 2024, alleging race discrimination, hostile work environment, and retaliation. On June 18, 2025, the EEOC issued a Notice of Right to Sue, which Mr. Williams received on July 17, 2025. This action was filed within ninety days of receipt.

244.    The retaliatory conduct occurring before May 24, 2022 (300 days before the March 18, 2024 EEOC charge) is part of the same unlawful employment practice that culminated in Mr. Williams's May 23, 2023 termination and continued through post-termination retaliation in 2024 and 2025. The acts described constitute a continuing violation, making the pre-May 24, 2022 conduct timely under the continuing violation doctrine.

245.    Mr. Williams engaged in protected activity under Title VII by opposing practices made unlawful by Title VII and participating in Title VII proceedings, including:

(a) July 17, 2019 Board Complaint: Mr. Williams co-authored and led a formal written complaint to the NMCRS Board of Directors detailing a "Loss in Confidence, and Toxic Work Environment" and explicitly citing "derogatory and arguably racist comments and off-color jokes" made by NMCRS leadership, particularly COO Pete Collins. This formal opposition to discriminatory practices constitutes protected activity under Title VII;

(b) May 12, 2020 Pension Exclusion Complaint: Mr. Williams formally protested in writing to CEO Jack Klimp his exclusion from pension plan discussions despite being the only officer actively participating in the plan, and subsequently advocated forcefully for employees affected by the proposed pension freeze. When allowed to participate in pension discussions, he spoke out against the discriminatory impact on older, longer-tenured workers, advocating for

employees who would be disproportionately harmed. This opposition to practices with discriminatory impact constitutes protected activity;

(c) July 19, 2020 Hiring Discrimination Complaint: Mr. Williams formally protested to CEO Klimp the unethical practice by which HR and the CAO unilaterally imposed a two-year salary freeze on a new IT director, Girish Pillai, characterizing the practice as "morally and ethically repugnant." This opposition to unfair employment practices constitutes protected activity;

(d) October 5, 2020 Bylaw Amendment Opposition: Mr. Williams formally objected in writing to the proposed bylaw amendment that would have removed him from the line of succession based on military service status, explicitly identifying it as "bias and discrimination against a CIO" and a "gratuitous insult." This opposition to discriminatory structural changes constitutes protected activity;

(e) Ongoing Opposition to Hostile Environment: Throughout 2020-2023, Mr. Williams repeatedly complained to CEO Klimp and other officers about the hostile work environment, including confronting CEO Klimp about the "invisible Black officer" incidents where Klimp publicly named and praised each white officer while skipping over Mr. Williams. Mr. Williams explicitly told CEO Klimp he was "very disturbed" by the exclusionary conduct and asked how such treatment made him feel. This continuing opposition to discriminatory treatment constitutes protected activity;

(f) August 23, 2022 PIP Protest: During the August 23, 2022 PIP meeting, Mr. Williams questioned the legitimacy of the PIP, asked for time to review the

document, and objected to being coerced into signing under threat. This opposition to pretextual discipline constitutes protected activity;

(g) Documentation of Discrimination: Throughout his employment and particularly during the coaching process beginning in August 2022, Mr. Williams documented instances of discrimination, hostile treatment, and disparate treatment. When the coaching consultant instructed him to "stop documenting things" during the November 24, 2022 coaching session, Mr. Williams refused and continued to maintain records of the discriminatory conduct. This documentation and refusal to suppress evidence of discrimination constitutes protected activity; and

(h) March 18, 2024 EEOC Charge: Mr. Williams filed a formal charge of discrimination with the EEOC, alleging race discrimination, hostile work environment, and retaliation. This formal participation in a Title VII proceeding constitutes protected activity.

246.    NMCRS subjected Mr. Williams to adverse employment actions in retaliation for his protected activity, including:

(a) Immediate Exclusion Following July 2019 Board Complaint: Within six months of his July 17, 2019 Board complaint, NMCRS removed Mr. Williams from the signature authority list in January 2020 (while all white officers retained theirs), excluded him from pension plan discussions in May 2020, stripped his 15-year hiring authority in June-July 2020, and attempted to amend bylaws to remove him from succession in October 2020. This systematic stripping of executive authorities immediately following his formal complaint about discrimination constitutes adverse action;

(b) Authority Stripping for Hiring Complaint: Immediately after Mr. Williams's July 19, 2020 complaint about the unethical salary freeze imposed on Girish Pillai, CEO Klimp responded by stripping Mr. Williams of his authority to set salaries and hiring terms for IT personnel, telling him he was "out of [his] lane." This removal of core executive responsibility in direct response to his complaint about unfair employment practices constitutes adverse action;

(c) Intensified Hostility Following Bylaw Opposition: After Mr. Williams formally objected to the discriminatory bylaw amendment in October 2020, white officers intensified their hostile conduct. Upon information and belief, COO Dawn Cutler reacted with visible anger when the amendment was rejected, and the collective disappointment of white officers fueled subsequent retaliatory actions, including the coordination documented in the "Soft Approach" memo to force his resignation. This intensified campaign constitutes adverse action;

(d) Fraudulent PIP and Predetermined Termination Plan: The August 2022 PIP, imposed shortly after Mr. Williams returned from FMLA leave and after he had engaged in multiple instances of protected activity, was part of the coordinated retaliation. The PIP was issued in August 2022, but leadership had already begun recruiting for his replacement in July 2022, demonstrating it was pretextual. The September 2020 "Soft Approach" memo and the March 2023 "fire Willie" directive prove the disciplinary process was retaliation for his protected complaints, not legitimate performance management. This fraudulent discipline and predetermined termination plan constitute adverse action;

(e) Termination on May 23, 2023: Mr. Williams's termination via ultimatum on May 23, 2023—just one day after he requested FMLA leave and nineteen days after his cardiac event—was the culmination of the retaliatory campaign. The termination was predetermined (as evidenced by the "fire Willie" directive) and executed at a moment of maximum vulnerability, exploiting his medical crisis. This termination constitutes the ultimate adverse action; and

(f) Targeting of Associated Employees: In November 2024, approximately 18 months after Mr. Williams's termination and eight months after his EEOC charge, NMCRS conducted a Reduction in Force eliminating only minority employees who had supported Mr. Williams or reported discrimination: Thelisha Woods (Black female Director who corroborated the hostile environment), Gabriella Telles (Hispanic female who reported the "crack the whip" remark to HR), and Richard Von Zimmer (gay, mixed-race employee). HR Director Tracy Brownstein explicitly admitted to Ms. Woods that she was being terminated because she "listened to Willie too much," and upon information and belief, COO Dawn Cutler similarly stated Woods was "too tied to Willie." This systematic elimination of witnesses and supporters constitutes adverse action demonstrating continuing retaliation.

247.    Mr. Williams's protected activity was a but-for cause of the adverse employment actions. The temporal proximity between his protected complaints and the adverse actions, combined with the direct evidence of retaliatory motive, establishes causation.

248.    218. NMCRS's retaliatory conduct was particularly egregious given CEO Klimp's February 24, 2020 written promise to staff that "There will be no retaliation against anyone by anyone for their decision to participate or not to participate in this follow-up investigation" into workplace harassment and discrimination. Despite this explicit written assurance, NMCRS subjected Mr. Williams—the primary complainant about the hostile environment—to systematic retaliation including the fraudulent PIP, predetermined termination plan, and ultimate termination during his medical crisis. The stark contrast between CEO Klimp's written promise of no retaliation and the coordinated retaliatory campaign that followed demonstrates NMCRS's bad faith and willful violation of Mr. Williams's protected rights.

249.    NMCRS's conduct was undertaken with malice or reckless indifference to Mr. Williams's federally protected rights. Senior managerial agents, including CEO Jack Klimp, CEO Robert Ruark, COO Dawn Cutler, CAO Chris Dour, and CFO Carolyn Bauer, acting within the scope of their employment, deliberately coordinated a multi-year retaliatory campaign documented in the "Soft Approach" memo and executed through the "fire Willie" directive. The deliberate timing of the termination one day after Mr. Williams's FMLA request, the post-filing obstruction of his personnel file, the November 2025 unencrypted disclosure of Social Security numbers and financial data, and the November 2024 elimination of witnesses and supporters with explicit admissions of retaliatory motive, all demonstrate reckless indifference to his protected rights and entitle Mr. Williams to punitive damages.

250.    As a direct and proximate result of NMCRS's unlawful retaliation, Mr. Williams has suffered and continues to suffer significant damages, including lost wages, lost benefits (including pension benefits lost by termination before his June 28, 2023 25-year service anniversary), emotional distress, exacerbation of medical conditions (including the syncope

event on May 24, 2023 caused by the stress of the retaliatory termination), mental health crisis requiring police intervention, reputational harm, invasion of privacy, credible risk of identity theft and financial fraud affecting both Mr. Williams and his wife, and other compensatory damages.

251.    Mr. Williams is entitled to compensatory and punitive damages, subject to the statutory cap of $300,000 for employers with more than 500 employees under 42 U.S.C. § 1981a(b)(3)(D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff WILLIE WILLIAMS respectfully requests that the Court enter judgment in his favor and against Defendant NAVY-MARINE CORPS RELIEF SOCIETY and award the following relief:

**A. Declaratory Relief**

   a. A declaration that Defendant violated Plaintiff's rights under 42 U.S.C. § 1981 by discriminating against him on the basis of race and subjecting him to a racially hostile work environment;

   b. A declaration that Defendant violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by discriminating against him on the basis of race, subjecting him to a racially hostile work environment, and retaliating against him for engaging in protected activity;

   c. A declaration that Defendant violated Plaintiff's rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., by discriminating against him on the basis of disability and failing to provide reasonable accommodations;

    d.  A declaration that Defendant violated Plaintiff's rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., by interfering with his exercise of FMLA rights and retaliating against him for requesting FMLA leave;

    e.  A declaration that Defendant violated Plaintiff's rights under the Virginia Human Rights Act, Va. Code § 2.2-3900 et seq., by discriminating against him on the basis of race and subjecting him to a racially hostile work environment;.

## B. Economic Damages

    a.  Back pay from May 23, 2023 to the present, with prejudgment interest;

    b.  Front pay through normal retirement age, or in the alternative, reinstatement to a comparable position with full seniority and benefits;

    c.  Lost pension and retirement benefits, including the value of benefits lost by termination before Mr. Williams's June 28, 2023 25-year service anniversary;

    d.  Lost health insurance benefits, including benefits lost during his critical cardiac recovery period from May 23, 2023 through June 30, 2023, and thereafter;

    e.  Medical expenses, past and future, including cardiac rehabilitation, ongoing cardiac treatment, psychiatric treatment for PTSD, anxiety and depression, and all other medical costs directly attributable to Defendant's unlawful conduct;

    f.  Lost stock, retirement, and other employment benefits to which Plaintiff would have been entitled but for Defendant's unlawful conduct;

    g.  All other economic losses.

## C. Non-Economic Damages

    a.  Compensatory damages for emotional distress, pain and suffering, reputational harm, and other non-economic losses, including:

b. Physical pain and suffering, including cardiac events in January 2018 and May 2023, syncope and collapse on May 24, 2023, and ongoing physical health consequences;

c. Mental and emotional distress, including PTSD symptoms, anxiety, depression, sleep disturbance, and mental health crisis in July 2023 requiring police intervention;

d. Humiliation, indignity, and public embarrassment;

e. Loss of enjoyment of life;

f. Damage to professional reputation and standing in the IT and national security community;

g. All other non-economic losses;

**D. Punitive Damages-** Punitive damages to the extent permitted by law, including:

a. Under 42 U.S.C. § 1981 (Counts One and Two): Compensatory and punitive damages without statutory cap;

b. Under Title VII, 42 U.S.C. § 2000e et seq. (Counts Three, Four, and Nine): Compensatory and punitive damages up to the statutory cap of $300,000 for employers with more than 500 employees pursuant to 42 U.S.C. § 1981a(b)(3)(D);

c. Under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (Count Five): Compensatory and punitive damages up to the statutory cap of $300,000 for employers with more than 500 employees pursuant to 42 U.S.C. § 1981a(b)(3)(D);

      d.  Under the Virginia Human Rights Act, Va. Code § 2.2-3900 et seq. (Counts

           Seven and Eight): Compensatory and punitive damages without statutory cap;

**E.  FMLA Damages**

      a.  Under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. (Count Six):

           An amount equal to any wages, salary, employment benefits, or other

           compensation denied or lost as a result of Defendant's violations, plus interest,

           pursuant to 29 U.S.C. § 2617(a)(1)(A)(i);

      b.  Liquidated damages equal to the amount described above, pursuant to 29 U.S.C. §

           2617(a)(1)(A)(iii), due to Defendant's willful violations;

**F.  Pre-Judgment and Post-Judgment Interest**

      a.  Pre-judgment interest on all damages awarded at the maximum rate permitted by

           law;

      b.  Post-judgment interest on all damages awarded at the maximum rate permitted by

           law;

**G.  Attorney's Fees and Costs-** Reasonable attorney's fees and costs of suit as authorized

    under law

**H.  Additional Relief-** Such other and further relief as this Court deems just, proper, and

    equitable.

## <u>JURY DEMAND</u>

**Plaintiff WILLIE WILLIAMS hereby demands a trial by jury on all issues so triable.**

November 21, 2025                        Respectfully submitted,


Adam S. Nadelhaft, VSB 91717
CHARLSON BREDEHOFT
COHEN BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
anadelhaft@cbcblaw.com
*Counsel for Plaintiff, Willie Williams*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of November, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

> Edward Lee Isler, Va. Bar No. 27985
> Micah E. Ticatch, Va. Bar No. 83351
> John W. H. Harding, Va. Bar No. 87602
> ISLER DARE, P.C.
> 1945 Old Gallows Road. Suite 650 Vienna, Virginia 22182
> Phone: (703) 748-2690
> Facsimile: (703) 748-2695
> Email: eisler@islerdare.com
> Email: mticatch@islerdare.com
> Email: jharding@islerdare.com
>
> *Counsel for Defendant*
> *Navy-Marine Corps Relief Society*

> Adam S. Nadelhaft, VSB 91717
> CHARLSON BREDEHOFT
> COHEN BROWN & NADELHAFT, P.C.
> 11260 Roger Bacon Drive, Suite 201
> Reston, Virginia 20190
> (703) 318-6800 Telephone
> (703) 318-6808 Facsimile
> anadelhaft@cbcblaw.com
> *Counsel for Plaintiff, Willie Williams*