# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | | |
|---|---|---|
| **WILLIE WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:25-cv-01766-MSN-LRV** |
| | ) | |
| **NAVY-MARINE CORPS RELIEF** | ) | |
| **SOCIETY** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

ARGUMENT ................................................................................................................. 4

    I.    The Society confuses timeliness with relevance and asks the Court to ignore relevant allegations. ........................................................................................................ 4

    II.    Mr. Williams plausibly alleges a hostile environment. ..................................... 6

        A.    All Mr. Williams's hostile-environment allegations are properly before the Court under the continuing-violation doctrine. ................................... 7

        B.    Mr. Williams endured systematic mistreatment because he is a Black man. ..... 9

        C.    The Society's hostile environment was severe and pervasive. .......................... 12

    III.    Mr. Williams plausibly alleges race-based discrimination. ............................................. 14

        A.    All the allegations of discrimination are properly before the Court under *Morgan*. ............................................................................................................. 14

        B.    The Society discriminated against Mr. Williams for being Black. ................... 14

    IV.    Mr. Williams plausibly alleges that the Society retaliated against him. ........................ 17

        A.    The Society was on notice that Mr. Williams was complaining about racism. 17

        B.    The Society fired Mr. Williams in retaliation for his protected complaints. .... 20

    V.    Mr. Williams plausibly alleges that the Society willfully violated the FMLA. ............. 22

        A.    The suspicious timing of the Society's termination infers causation. .............. 24

        B.    The Society slow-rolled its response to Mr. Williams's FMLA request to interfere with his benefits. ................................................................................. 25

    VI.    Mr. Williams has plausibly stated a claim for discrimination under the ADA. ............. 26

    VII.    Alternatively, the Court should grant Mr. Williams leave to amend. ............................ 28

CONCLUSION .............................................................................................................. 29

## **TABLE OF AUTHORITIES**

### **Cases**

*Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422 (4th Cir. 2015). ........................................ 24

*Adams v. Home Depot USA, Inc.*, 2007 U.S. Dist. LEXIS 103550 (D. Or. Sep. 5, 2007)............ 10

*Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006) .............................................................................. 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................. 4

*Barnett v. Inova Health Care Servs.*, 125 F.4th 465 (4th Cir. 2025) ............................................. 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)…………………………………………...…12

*Bland v. Fairfax Cnty.,* 2011 U.S. Dist. LEXIS 47164 (E.D. Va. May 3, 2011) .......................... 13

*Blankenship v. Buchanan General Hospital*, 140 F. Supp. 2d 668 (W.D. Va. 2001) ................... 24

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) .......................................... 12

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536 (4th Cir. 2003). .......................................... 18

*Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179 (4th Cir. 2000) .................................... 11

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306 (4th Cir. 2008) ....................................................... 12

*Finley v. Kraft Heinz, Inc.*, 146 F.4th 382 (4th Cir. 2025)……………………………………….28

*Guessous v. Fairview Property Investors*, 828 F.3d 208 (4th Cir. 2016). ......................... 5, 8-9, 18

*Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993) ....................................................................... 12-13

*Holloway v. Md.*, 32 F.4th 293 (4th Cir. 2022) ............................................................................. 20

*Jalmiran v. Alutiiq Commer. Enter., LLC*, 639 F. Supp. 3d 60 (E.D. Va. 2022) ...................... 20-21

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) .............................................................. 8

*Karnes v. Midland Credit Mgmt.*, 2025 U.S. Dist. LEXIS 5518 (W.D. Va. Mar. 25, 2025) ......... 26

*Kelly v. Town of Abingdon*, 90 F.4th 158 (4th Cir. 2024) ............................................................. 27

*Lettieri v. Equant, Inc.*, 478 F.3d 640 (4th Cir. 2007) ................................................................. 20

*McCarty v. City of Alexandria*, 2024 U.S. Dist. LEXIS 224544 (E.D. Va. Dec. 11, 2024) .......... 17

*McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973) .......................................................... 15

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) ............................................ 23

*McMillian v. King & Queen Cnty. Sch. Bd.*, 2020 U.S. Dist. LEXIS 169774 (E.D. Va. Sep. 15, 2020) .................................................................................. 21-22

*Mickens v. Serco, Inc.*, 2025 U.S. Dist. LEXIS 58523 (E.D. Va. Mar. 27, 2025) ........................ 26

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) .................................................... 165

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ........................................ passim

*Sorto v. Autozone, Inc.*, 821 F. App'x 188 (4th Cir. 2020) (unpublished). ...................................... 10

*Sunkins v. Hampton Rds. Connector Partners*, 701 F. Supp. 3d 342 (E.D. Va. 2023) ....... 13, 17-19

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ................................................ 11-12

*Townes v. Md. Dep't of Juvenile Servs.*, 2015 U.S. Dist. LEXIS 137332 (D. Md. Oct. 8, 2015) . 23

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) .................................................... 4

*Wright v. Sw. Airlines Co.*, 2008 U.S. Dist. LEXIS 66659 (D. Md. Aug. 21, 2008) .................... 25

*Wrightson v. Pizza Hut of Am.*, 99 F.3d 138 (4th Cir. 1996) ........................................ 6-7

## **Statutes**

2 U.S.C. § 2000e-5(e)(1) ............................................................................ 8

29 U.S.C. § 2601 .................................................................................. 2

29 U.S.C. § 2617(c)(1)-(2) ........................................................................ 23

42 U.S.C. § 12101 ................................................................................ 2

42 U.S.C. § 1981 ................................................................................. 1

42 U.S.C. § 2000e ............................................................................... 1

Va. Code § 2.2-3900 ............................................................................. 1

Va. Code § 2.2-3907(A) .......................................................................... 8

## **Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................... 4

Fed. R. Civ. P. 15(a)(2) .......................................................................... 28

Fed. R. Civ. P. 8(a)(3) ........................................................................... 25

## INTRODUCTION

Willie Williams gave nearly 25-years of his life to the Navy-Marine Corps Relief Society (the "Society"). And the Society repaid him by terminating him just before his 25th anniversary.

Before his termination, Mr. Williams maintained a sterling record. He progressively rose through the ranks, starting as a network analyst and working his way up to Vice President and Chief Information Officer. During his tenure, he championed a number of accomplishments, like designing and implementing the VPN architecture and designing and maintaining a management system that passed every audit under his supervision.

Mr. Williams was the only Black executive in the Society's 119-year history. This should have been reason for celebration. Instead, the Society discriminated against him, with executives making derogatory comments, hateful epithets, and generally engaging in course of conduct to disenfranchise and ostracize Mr. Williams.

When Mr. Williams complained, the Society retaliated—removing basic privileges of his position, proposing policies that exclusively targeted Mr. Williams, and eventually placing him on a pretextual performance improvement plan ("PIP"). During the PIP, Mr. Williams confided that he was cataloging the discrimination that he faced. In response, the Society told him to stop making a record.

After the pretextual PIP finished, Mr. Williams suffered a heart attack. He returned to work that same month to request FMLA leave. The day after he submitted his written request for leave, the Society fired him.

Based on these actions described more fully in Mr. Williams's Amended Complaint ("Complaint"), Mr. Williams brings claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e; 42 U.S.C. § 1981; the Virginia Human Rights Act ("VHRA"), Va. Code § 2.2-3900; the

1

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101; and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601.

The Society moves for complete dismissal under Federal Rule of Civil Procedure 12(b)(6). But Mr. Williams has plausibly alleged his claims. And the Society's contrary arguments are rooted in inapposite cases and a repeat tactic of impermissibly disaggregating its pattern of racism and hostility to try to create discrete acts, rather than looking at the totality of the circumstances. Accordingly, the Court should deny the Society's Motion.

## **FACTUAL BACKGROUND**

Mr. Williams's tenure was marked with overt racist comments in concert with systemic disenfranchisement. From 2017 to February 2020, Pete Collins, the Society's COO made a number of overt racist comments to or about Mr. Williams, including explicitly and derogatorily "referring to Mr. Williams's IT department as being run by 'a black.'" Compl. at ¶ 35. During that same time period, he launched investigations of Mr. Williams based on spurious allegations, *id*. at ¶ 11. In response to the COO's demeaning and hostile behavior, Mr. Williams filed a formal complaint in July 2019. The Society investigated the behavior of the COO, and other executives, both internally and via outside counsel. *Id*. at ¶¶ 42, 45.

The investigation from outside counsel culminated in an April 2020 letter that described Mr. Collins as having engaged in a "witch hunt" to target Mr. Williams – his Black colleague. *Id*. at ¶ 42. The Society's internal investigation described Mr. Collins (and others) as making "deliberate effort . . . to undermine" Mr. Williams, the only Black executive. *Id*. at ¶ 45.

Despite those damning results, once the investigations wrapped up, the Society engaged in a series of actions that disenfranchised Mr. Williams. This included removing Mr. Williams's privileges, such as security access, *id*. at ¶47; salary-setting authority; *id*. at ¶ 54; trying to amend

the Society bylaws to officially demote only Mr. Williams, *id*. at ¶ 56; and denying him office space (while giving office space to every other C-suite executive, all of whom were Caucasian), *id*. at ¶ 73.

These actions were not coincidental. At some point, Mr. Williams learned of a memo from September 2020, called the "soft approach" memo, which catalogued a plan to force Mr. Williams out while explicitly noting that the force-out was not about performance. *Id*. at ¶ 55.

From 2021 through 2022, the "soft approach" continued. Society higherups consistently ignored Mr. Williams—often going out of their way to compliment others to specifically exclude Mr. Williams. *Id*. at ¶¶ 60-62.

But eventually, overt racism would seep through the cracks of the "soft approach" façade. For example, in June 2022, the white COO was openly complaining to other executives that they needed to "crack the whip" on Mr. Williams, *id*. at ¶ 74—a racial epithet that brings to mind a slave overseer cracking whips on Black slaves. Mr. Williams complained, but the Society took no action. *See id*.

After enduring the racial epithet, Mr. Williams took FMLA leave. This lasted from July to August 2022. *Id*. at ¶¶ 80, 86. When he returned from the leave, the CEO immediately singled out Mr. Williams for a PIP. *Id*. at ¶ 85.

Supposedly, the PIP was intended to help Mr. Williams. But that was pretextual, as in September 2022, while the PIP was ongoing, the Society was openly hiring for Mr. Williams's position. *Id*. at ¶ 101. And in November 2022, also during the PIP, Mr. Williams shared that he was cataloguing the discrimination he had endured. *Id*. at ¶ 99. The Society responded by telling him to stop making a record. *Id*.

Mr. Williams suffered a heart attack on May 4, 2023. Compl. at ¶ 112. Twelve days later, on May 16, 2023, he verbally requested FMLA leave. *Id.* at ¶ 114. Rather than facilitate the leave, the Society told Mr. Williams they would "talk about it later" and deferred all discussions. *Id.* Given the Society's non-responsiveness, Mr. Williams then requested leave in writing on May 22, 2023. *Id.* at ¶ 115. The next day, the Society terminated him. *Id.* at ¶ 116.

\*    \*    \*

The totality of these allegations is a 30-month campaign of discrimination and hostility from the initial July 2019 complaint through the May 2023 termination—all of which gives rise to Mr. Williams claims for a hostile environment, racial discrimination, disability discrimination, and retaliation.

## <u>ARGUMENT</u>

A motion under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint states a plausible claim for relief. To determine whether there is a plausible claim, the court accepts as true all the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court must also make all factual inferences in favor of the plaintiff. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022). Applying these standards here, Mr. Williams plausibly alleges his claims of hostile environment, discrimination, and retaliation.

**I.    The Society confuses timeliness with relevance and asks the Court to ignore relevant allegations.**

As an initial matter, the Society does not dispute that Mr. William's Complaint is timely. *See generally* Mot. Instead, the Society makes a confused argument where it contends that the Court can consider only allegations that fall within the statute of limitations. *See, e.g.,* Mot. at 6-7. As for any allegation outside those statutory periods, the Society asks the Court to put on

blinders and wholesale "disregard" them. *Id.* at 7. But there is no support for this extraordinary request. In fact, Supreme Court precedent forecloses this.

In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court examined what is and is not a timely claim under Title VII. It explained that discrete, discriminatory actions that occur outside the statutory period cannot, by themselves, form the basis of a cause of action. *Id.* at 105. But those actions can come into play in two ways. First, otherwise untimely actions can become timely if they are part of a continuing violation. *Id.* at 118. The classic example of this is a hostile-environment claim. Hostile-environment claims are ongoing in nature because the "one unlawful employment practice" is a series of acts that create the hostile environment. *Id.* As a result, a hostile-environment claim is live so long as one discriminatory act occurred during the statutory period. *Id.* "Furthermore, the plaintiff may recover for all of the harm resulting from the hostile work environment, not just those contributing acts that occurred during the statutory period." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 222 (4th Cir. 2016); *see also Morgan*, at 536 U.S. at 119.

Second, if a discrete, discriminatory action is outside the statutory period and not part of a continuing violation, the action can nevertheless be used "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

Either way, there is no scenario for what the Society pushes—where a Court simply ignores relevant allegations. Here, all of Mr. Williams's allegations are relevant, even if the allegation is not an independent basis for a cause of action. Following *Morgan*, the discriminatory actions that Mr. Williams alleges are either (i) an independent basis for liability; (ii) part of a continuing violation; or (iii) background evidence of the Society's discrimination.

## II.    Mr. Williams plausibly alleges a hostile environment.

In stating a claim for hostile environment, Mr. Williams has plausibly alleged (1) unwelcome harassment; (2) based on his race; (3) sufficiently severe or pervasive to alter the conditions of employment; and (4) some basis for imposing liability on the Society. *Wrightson v. Pizza Hut of Am.*, 99 F.3d 138, 142 (4th Cir. 1996).

The Society created a hostile environment via direct racism in tandem with systemic disenfranchisement. From 2017 to February 2020, the Society's COO made a number of racist comments, including explicitly and derogatorily referring to Mr. Williams's IT department as being run by "a black." Compl. at ¶ 35. During that same period, he launched investigations into Mr. Williams—all of which were based on spurious allegations of "financial impropriety." *Id.* at ¶ 36. In July 2019, Mr. Williams filed a formal complaint about the pervasive racism and mistreatment. The Society investigated internally and via outside counsel. *Id.* at ¶¶ 42, 45. The investigations wrapped up in April 2020 by concluding that Mr. Williams had been subjected to a "witch hunt" and "deliberate effort[s]" to undermine him. *Id.*

Rather than remedying the mistreatment, the Society engaged in a series of actions that continued the hostile work environment and disenfranchised Mr. Williams. This included removing Mr. Williams's privileges, such as security access, *id.* at ¶47; salary-setting authority, *id.* at ¶ 54; trying to amend the Society bylaws to officially demote only Mr. Williams, *id.* at ¶ 56; and denying him office space (while giving office space to every other C-suite executive), *id.* at ¶ 73.

All these actions were consistent with the September 2020 "soft approach" memo to force out Mr. Williams. *Id.* at ¶ 55. And from 2021 through 2022, the "soft approach" continued. Society higherups consistently ignored Mr. Williams—often going out of their way to compliment others to specifically exclude Mr. Williams. *Id.* at ¶¶ 60-62.

In June 2022, the white COO was openly complaining that the Society needed to "crack the whip" on Mr. Williams. *Id*. at ¶ 74. Although Mr. Williams complained, there was no remedy. *See id*. Instead, two months later, he was singled out for a PIP. *Id*. at ¶ 85. The hostile work environment based on Mr. Williams's race continued.

Supposedly, the PIP was intended to help Mr. Williams, but the Society had begun overtly recruiting Mr. Williams's replacement in September 2022, while the PIP was ongoing. *Id*. at ¶ 101. And in November 2022, also during the PIP, Mr. Williams shared that he was making a record of the discrimination he had endured. *Id*. at ¶ 99. The Society responded by telling him to keep quiet, *id.*, kept him on the PIP, *see id*., and then, once the PIP had wrapped up, fired him, *id*. at ¶ 110.

This 30-month campaign to systematically undermine, disenfranchise, and terminate Mr. Williams constitutes a hostile environment.

*      *      *

In response to these allegations, the Society challenges elements two and three of a hostile environment—that is, whether the above actions were based on race and whether the actions were severe or pervasive. *Wrightson*, 99 F.3d at 142. The Society also disputes whether all the discriminatory acts give rise to liability under the continuing-violation doctrine. Mr. Williams addresses each argument in turn.

### A.    All Mr. Williams's hostile-environment allegations are properly before the Court under the continuing-violation doctrine.

As explained above, hostile-environment claims are a classic ongoing violation, where the single unlawful act—a hostile environment—is comprised of a number of discriminatory

acts. *Morgan*, 536 U.S. at 118. And so long as one of the discriminatory acts occurred during the statutory time period, the employer is liable for all the underlying discriminatory acts.

Under Title VII and VHRA, all discriminatory acts that occurred within 300 days of the Charge give rise to liability—here, that period is May 23, 2023 to March 18, 2024. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII); Va. Code § 2.2-3907(A) (VHRA). For a hostile environment under § 1981, all discriminatory acts that occurred within four years from the Complaint give rise to liability—October 14, 2021 to October 14, 2025. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 385 (2004).

There is no dispute that the Society terminated Mr. Williams during the above statutory periods. And terminations are part of a hostile environment. In *Guessous v. Fairview Property Investors*, for example, the plaintiff brought a claim for a hostile environment under Title VII. 828 F.3d 208, 210 (4th Cir. 2016). Her deposition testimony recounted "numerous allegations of mistreatment by [her employer] during the final four-years of her employment," the majority of which were inappropriate statements about her ethnicity and religion from late 2008 through late 2011. *Id.* at 211. In late 2011, the inappropriate statements "slowed," and continued to be less frequent through 2012. *Id.* In late 2012, after returning from maternity leave, the employer had reassigned much of her work. *Id.* In December 2012, the plaintiff confronted her manager about the reassignments and his past inappropriate statements; three months later, she was fired. *Id.* When assessing the hostile-environment claim, only two of the underlying discriminatory acts occurred during the statutory time period—the work reassignments and termination. *Id.* at 222. The district court granted summary judgment, holding that the claim was time barred because the discrete acts of termination and reassigning work were "separately actionable" and therefore not "part of a hostile work environment claim." *Id.* The Fourth Circuit reversed and held that so long

8

as a discrete act "is part of the pattern of discriminatory treatment, then that act should be sufficient for purposes of the continuing-violation doctrine, even if the act would otherwise qualify as a discrete act that is independently actionable." *Id.* at 223. Thus, the reassignments and the termination "contributed to the hostile work environment and [made] that claim timely." *Id.*

*Guessous* neatly applies here. Mr. Williams endured a number of racist comments and discriminatory acts from the C-suite over the course of several years that ebbed and flowed at various points. Also like *Guessous*, Mr. Williams returned from his protected leave to learn that he was being put on a PIP; he confronted the Society with the fact that he had been cataloging instances of discrimination and, a few months later, he was fired.

Tellingly, the Society does not address Mr. Williams's termination in the context of the continuing-violation doctrine. But following *Guessous*, the Society's decision to terminate Mr. Williams was part of its discriminatory course of conduct that underlies the hostile environment claim and the discrimination claims. And because the termination is part of the hostile environment, the Society is liable for all the discriminatory acts alleged under Title VII, VHRA, and § 1981.[1]

### B.    Mr. Williams endured systematic mistreatment because he is a Black man.

When challenging element two—whether the conduct was based on Mr. Williams's race—the Society first contends that "crack the whip" is race neutral, because the phrase was first recorded in 1647 in the context of cracking whips on horse-drawn wagons. Mot. at 8. But that is an impermissible inference against Mr. Williams. Moreover, even race-neutral comments can be "probative of bias" depending on "various factors including context, inflection, tone of

---

[1]    For the § 1981 hostile-environment claim, the four-year statutory period captures the termination, as well acts from October 2021 forward, such as the "crack the whip" epithet, Compl. at ¶ 74, the systematic ignoring of Mr. Williams, *id.* at ¶¶ 60-62, and the pretextual PIP, *id.* at ¶ 85.

voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). For example, the term "boy" is race neutral until you use it to refer to a Black man. *Id*. On the other hand, in *Sorto v. Autozone, Inc.*, which the Society cites, a panel of the Fourth Circuit observed that the plaintiff had not demonstrated how comparisons to sheep or Hello Kitty "are commonly associated with people of Hispanic origin." 821 F. App'x 188, 191 (4th Cir. 2020) (unpublished).

In short, context matters. "Depending on the context, the reference to cracking a whip could be considered an innocent expression to motivate a person to action or, alternatively, as a reference to slavery." *Adams v. Home Depot USA, Inc.*, 2007 U.S. Dist. LEXIS 103550, at *43 (D. Or. Sep. 5, 2007); *see id*. (Title VII claim survived summary judgment where "cracking the whip" was, in context, a racist comment). Here, the Society's COO is not alleged to have used the phrase more generally or in reference to an animal, object, or method—if that were the case, then maybe a reasonable person would hear the phrase and think of a 1600s horse-drawn wagon. Instead, the Society's COO used the phrase solely and specifically to refer to cracking the whip on the *only* Black executive. In this context, the overtone is a hateful, racist image.

Mixed in with the overly racist statements are the many instances over the 30-month period between the July 2019 complaint and the May 2023 termination in which the Society harassed Mr. Williams by treating him worse than his white peers. It is alleged that for nearly his entire 25-year career, Mr. Williams had a spotless record. *E.g.* Compl. at ¶¶ 24-25, 27-32. But once he complained about racism in July 2019, he endured an approximately 30-month campaign of hostility. Not only did he still have to endure racist comments, ¶ 74, but he alleges near monthly occurrences of the Society stripping away his authority, *id*. at ¶¶ 47, 54, ignoring him, *id*. at ¶¶ 48, 60-62, denying him basic privileges, *id*. at ¶ 73, and singling him out for a PIP, *id*. at

¶ 79. Then, during the PIP, the Society starts actively recruiting his replacement, *id*. at ¶ 101, and tells him to stop making a record of the Society's many instances of discrimination, *id.*at ¶ 99.

In response to this pattern of hostility, the Society argues that those incidents have "no tangible relationship to [Mr. Williams's] race." Mot. at 7. But this ignores the broader context in which these actions took place—which is contrary to Fourth Circuit precedent. The Fourth Circuit emphasized the importance of taking a totality approach in *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179 (4th Cir. 2000). There, the court vacated summary judgment because the district court "disaggregated" the gendered statements from the disparate treatment, which made it easier to make inferences against the plaintiff. *Id.* at 194. A salient feature of *Connor* were allegations of overt mistreatment in tandem with facially neutral actions—which is what happened here. Mr. Williams had excellent performance and a clean disciplinary record until he made the July 2019 complaint about racism. After that, the 30-month campaign to systemically disenfranchise him began. Mr. Williams had to endure hateful, racist comments from other executives in tandem with consistent, hostile behavior to undermine and ostracize him. The Court cannot disentangle the overt racism that is enmeshed in the broader pattern of mistreatment.

Nevertheless, the Society speculates that there could be alternative, race-neutral reasons for consistently targeting Mr. Williams. Mot. at 7-8. Whether the Society can justify its hostile act with nondiscriminatory explanations is a fact question for trial. The Society's alternative explanations are irrelevant when evaluating the sufficiency of the Complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Here, the totality of the conduct plausibly alleges a pattern of discrimination that Mr. Williams would not have had to endure but for his race.

C.      The Society's hostile environment was severe and pervasive.

A hostile environment "can be determined only by looking at all the circumstances."

*Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Circumstances include the frequency or severity

of the discrimination; "whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

Circumstances can also include the effects on the employee's physical or psychological

wellbeing, *id.*, as well as the impact of the discrimination on the employee's job performance. *Id.*

Ultimately, everything is context dependent. For example, severity outweighed frequency

when a manager twice referred to a black employee as a "porch monkey," because that slur was

offensive enough to create a fact dispute about a hostile environment. *Boyer-Liberto v.*

*Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015). This is why "no single factor is

required" to plausibly allege a hostile environment. *Harris*, 510 U.S. at 23.

Although proving a hostile environment is a demanding task, the "high bar" language that

the Society latches onto is plucked from a Fourth Circuit case evaluating a summary-judgment

appeal—in that context, the court observed that "plaintiffs must clear a high bar in order to

satisfy the severe or pervasive test." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir.

2008). At the pleadings stage, plausibility does not require the plaintiff to "establish a prima facie

case." *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 470 (4th Cir. 2025). Whether an

element has been satisfied is "an evidentiary standard, not a pleading requirement."

*Swierkiewicz*, 534 U.S. at 511.

Here, Mr. Williams had pled facts "that raise a right to relief above the speculative

level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Mr. Williams's spotless record, *e.g.*

Compl. at ¶¶ 24-25, 27-32, was juxtaposed with overt racism, *id.* at ¶ 74, near monthly

occurrences of the Society treating him worse than his white peers, *id.* at ¶¶ 48, 60-62, 73, 79,

and a top-down directive to stop making a record of the Society's many instances of discrimination, *id.* at ¶ 99.

These allegations are consistent with cases that have survived even summary judgment. In *Bland v. Fairfax Cnty.,* for example, the plaintiff alleged that her supervisor made sexual comments at three in-person meetings and six telephone conversations over a six-year period. 2011 U.S. Dist. LEXIS 47164, at *13-15 (E.D. Va. May 3, 2011). Despite the relatively low frequency of incidents, the court found that a reasonable juror could determine that the "conduct was severe or pervasive enough to create an abusive work environment." *Id.* at *42. In contrast to *Bland*, Mr. Williams alleges more discriminatory acts and a more truncated period of only 30 months.

Moreover, "[c]ourts in the Fourth Circuit regularly place greater weight on misconduct when the perpetrator is the plaintiff's supervisor." *Sunkins v. Hampton Rds. Connector Partners*, 701 F. Supp. 3d 342, 354 (E.D. Va. 2023). And Mr. Williams alleges that the racial epithet, the derogatory comment about his department being run "by a Black," and the disparate, hostile treatment all came from supervisors, including the CEO. *See id*. at ¶¶ 35 (COO racist comment), 74 (COO racist comment), 88 (CEO initiates the PIP).

In response, the Society characterizes these events as isolated incidents and speculates about alternative explanations. *See* Mot. at 15-16. The Society even goes so far as to attribute its actions to Mr. Williams's supposed poor performance. *See id.* But the obvious reasonable inference is that the Society's hostilities created the very environment the Supreme Court warned about in *Harris*, where abuses "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." 510 U.S. at 22. Mr. Williams alleges that he had no performance issues—as confirmed from his many accolades and

compliments, *e.g.* ¶¶ 24-25, 27-32—*until he complained about racism*. To the extent that there were genuine performance issues, it is for a jury to decide whether those performance issues are fairly attributed to the Society's hostilities. At this stage, it is enough that the facts allege a more-than-speculative work environment of severe and pervasive discrimination.

**III.    Mr. Williams plausibly alleges race-based discrimination.**

Much of the allegations and analysis that underlie the hostile-environment claim apply with equal force to Mr. William's disparate-treatment claim. This includes the application of the continuing-violation doctrine.

**A.    All the allegations of discrimination are properly before the Court under *Morgan*.**

Although *Morgan* was specific to hostile-environment claims, the Supreme Court did not specifically limit the continuing violation doctrine to such claims. *See Morgan*, 536 U.S. at 115 n.9.  And Mr. Williams's discrimination claims in Counts 1, 3, and 7 do not seek to hold the Society liable for discrete acts like retaliation, a demotion, or an instance of unequal pay. Instead, he alleges a pattern of mistreatment comprised of overt racism in tandem with nefarious disenfranchisement—all of which culminated in his termination. Thus, the various discriminatory acts that prompted the termination can be viewed as part of a broader pattern or, in the alternative, as additional background evidence that supports that the termination was discriminatory. *See id.* at 113.

**B.    The Society discriminated against Mr. Williams for being Black.**

The basic elements of disparate treatment are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) an inference that the

adverse employment action was due to unlawful discrimination. *McDonnell Douglas Corp*. v. *Green*, 411 U.S. 792, 802 (1973).

Mr. Williams plausibly alleges every element. He was a high-performing executive, who received numerous internal and external accolades over his 25-year career. *E.g.* Compl. at ¶¶ 24-25, 27-32. The only indication of unsatisfactory performance was the PIP. But various facts suggest that the PIP was pretextual—including, (i) the Society started recruiting Mr. Williams's replacement before and during the PIP, *id*. at ¶¶ 79, 101; (ii) at least one rationale (the need for a deputy director) was patently false, *id*. at ¶ 91; (iii) Mr. Williams was the only executive singled out for a PIP, *id*. at ¶ 102; and (iv) the CEO that initiated the PIP left during the PIP and told the incoming CEO to fire Mr. Williams, *id*. at ¶ 109. Further, the fact that the Society told Mr. Williams to stop making a record of discrimination during the PIP is also probative of pretext, *id*. at ¶ 99—if the PIP were legitimate, the Society should have been at least curious about whether a perverse work environment was affecting his performance.

Despite Mr. Williams's superior performance, he faced pervasive, persistent discrimination from the July 2019 complaint through the May 2023 termination. And, in fact, the discrimination ramped up in the months before the termination.

In June 2022, Mr. Williams endures the racist "crack the whip" epithet. *Id.* at ¶ 74. He complains, but the Society does nothing. *See id.* Then, between June and August 2022, he takes FMLA leave. *Id*. at ¶¶ 80, 86. When he returns from leave, he is immediately placed on the PIP. *Id.* at ¶ 85. Then, during the PIP, he is told to stop making a record of the incidents of racism that he has endured. *Id.*at ¶ 99. And once the PIP wraps up, the Society fires him.  These are all adverse actions. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024) ("To make out a

Title VII discrimination claim, a [Plaintiff] must show some harm respecting an identifiable term or condition of employment" rejecting the "materially adverse" standard)

In response to these allegations, the Society disputes only whether its adverse actions against Mr. Williams give rise to an inference of discrimination. *See* Mot. at 14-15. Specifically, it argues that Mr. Williams alleges only scattered events, untethered to a racial animus. *Id*.

This is not so. The discriminatory behavior that preceded the termination occurred in a truncated timeline, which began in June 2022 with the racist epithet. The timeline was essentially paused from July to August when Mr. Williams is on FMLA leave. But when the timeline restarted in August, the Society immediately placed Mr. Williams on the PIP. Then in November 2022, the Society told him to stop making a record of discrimination, and after the PIP concluded, the Society fired him in May 2023.

Tellingly, the Society does not argue that this June-May timeframe is prohibitively long. *See id.* Instead, the Society casts aspersions of allegations about discriminatory conduct from 2017, *id.* at 15. Those aspersions are not legal arguments that make Mr. Williams's allegations implausible.

Next, the Society contends that the Court cannot infer a discriminatory animus because the executives who discriminated against Mr. Williams did not take part in his termination. But the allegations belie this. The exact chain of command will come out in discovery, but the allegations make clear that every instance of discrimination came from the top-down. For example, the racist epithet came from the COO, Compl. at ¶ 74; the CEO initiated the PIP, *id.* at ¶ 88; that same CEO left during the PIP but told the incoming CEO to fire Mr. Williams, *id.* at ¶ 109; and the incoming CEO did, in fact, fire Mr. Williams after the PIP was complete, *id.* at 110. Moreover, Mr. Williams alleges that the executives were working together to push him out,

as evidenced by the "soft approach" memo that was circulated among everyone in the C-suite, besides Mr. Williams. *Id.* at ¶ 143.

Finally, the Society argues that Mr. Williams cannot infer animus by comparing his treatment to other employees. There is no authority for this. In fact, "[t]he treatment of others . . . may assist in demonstrating that a work environment was objectively hostile." *McCarty v. City of Alexandria*, 2024 U.S. Dist. LEXIS 224544, at *12 (E.D. Va. Dec. 11, 2024). And here, Mr. Williams alleges that other C-suite level executives, all of whom were white, did not endure the same treatment as him. None endured racist comments. None were placed on a PIP. None were denied basic privileges of their positions like security access, salary-setting authority, and real office space. None were systematically ignored or ostracized. And none were terminated after a years-long campaign of racist hostilities. With these allegations, Mr. Williams is demonstrating how the Society's preferential treatment of white executives is probative of racial animus.

## IV.    Mr. Williams plausibly alleges that the Society retaliated against him.

The elements of retaliation are (i) a protected activity; (ii) an adverse action; and (iii) a causal connection between the protected activity and the adverse action. *Sunkins*, 701 F. Supp. 3d at 358.

In challenging the retaliation claim, the Society focuses only on elements one and three—that is, a protected activity and the link between the activity and the adverse action. *Id.* But Mr. Williams has plausibly alleged both a protected activity and a causal connection between his complaints and the termination.

### A.    The Society was on notice that Mr. Williams was complaining about racism.

Protected activities generally fall into two categories, participating in a protected activity or opposing an unlawful activity. *Id*. Employees engage in protected oppositional activity when they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l*

*Med. Ctrs., Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003). At the pleadings stage, plaintiffs need only plead facts to plausibly allege that the employer "either understood or should have understood the employee to be engaged in protected activity." *Sunkins*, 701 F. Supp. 3d at 358.

Mr. Williams alleges the following complaints: (i) July 2019, in response to the racist comments and the COO's witch hunt, Compl. at ¶ 38; (ii) in October 2020, in response to the discriminatory proposed bylaw, *id.* at ¶ 57; in August 2022, in response to the PIP, *id.* at ¶ 245(f); and in November 2022 in response to the constant barrage of discriminatory actions. as discrimination complaints, *id.* at 99. These protected actions resulted in a series of retaliatory acts, all of which culminated in the May 2023 retaliatory termination.[2]

The Society argues that these actions would not have put the Society on notice that Mr. Williams was complaining about racism. *See* Mot. at 18-20 (contending that Mr. Williams did not complain about racism); *see also id.* at 20 (contending that the CEO was unaware of any complaints). But this is an unreasonable conclusion based on unfavorable inferences.

Mr. Williams alleges that the complaints from July, October, and November overtly characterized the complaints as discrimination complaints. Compl. at ¶¶ 38, 57, 99. Further, the facts and reasonable inferences also support that the Society would have understood that each of the complaints were discrimination complaints.

Consider the November 2022 complaint: Mr. Williams shared with the PIP facilitator that he was cataloguing instances of discrimination. Compl. at ¶ 99. The Society's response was not curiosity or ambiguous equivocation. *See id.* The Society told Mr. Williams to stop making a

---

[2]    The Society's liability is confined to the termination. *Guessous*, 828 F.3d at 222. But the prior complaints and retaliatory acts are "background evidence," *Morgan*, 536 U.S. at 113, probative of the Society's animus to Mr. Williams and its habit of responding to Mr. Williams's protected activities with hostility, ostracization, and disenfranchisement.

record. *Id*. This infers that the Society understood exactly what Mr. Williams was concerned about, and it chose to respond with hostility that, only a few months later, would result in the retaliatory termination.

As for the August 2022 complaint about the PIP, Mr. Williams alleges that he questioned the PIP's legitimacy to the CEO. *Id.* at ¶ 245(f). The Society interprets this complaint in a way most favorable to it, characterizing the complaint as a nonunique response to a PIP. Mot. at 19. But the facts do not support this inference. Mr. Williams alleges that the PIP was pretextual because, among other things, (i) he was the only officer singled out for a PIP, despite other failings from white officers, like the COO and CAO's respective failures to fill vacancies, Compl. at ¶¶ 91, 102; (iii) the Society publicly recruited his replacement during the PIP, *id*. at ¶ 101; and (iii) the Society told Mr. Williams during the PIP to stop making a record of discrimination, *id.* at ¶ 99. In this context, the reasonable inference is not that Mr. Williams was esoterically objecting to the PIP; instead, he was objecting to the fact that the PIP was a pretextual means to target the only Black executive.

In terms of imputing these complaints to the Society, the CEO, Jack Klimp, put Mr. Williams on the PIP, *id.* at ¶ 88, which immediately infers that the CEO was monitoring the PIP and would be made aware of any developments. Moreover, the complaint occurred during the PIP, *id.* at ¶ 99, and was made to one of the PIP facilitators, *id*. Although the CEO that fired Mr. Williams joined in December 2022, it is reasonable to infer that new CEO took over the same responsibilities as the former CEO, including the PIP, and that he would be made aware of the complaints prior to terminating Mr. Williams. Accordingly, Mr. Williams has plausibly alleged that the Society "either understood or should have understood" that he was making protected, racial-discrimination complaints. *Sunkins*, 701 F. Supp. 3d at 359.

**B.      The Society fired Mr. Williams in retaliation for his protected complaints.**

Plaintiffs allege causality between the protected activity and the adverse action by temporal proximity or some other indicia of causality. *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). Here, the last alleged complaint occurred in November 2022, when Mr. Williams told the Society that he was cataloguing the discrimination he had faced. Compl. at ¶ 99. It was only six or so months later that the Society fired him, in May 2023. *Id.* at ¶ 110. This is enough temporal proximity to infer causality. In *Carter v. Ball*, the Fourth Circuit affirmed the denial of a motion to dismiss and concluded that the temporal proximity of six months between a February 9 complaint and the July 26 termination was "sufficient to establish a *prima facie* case of retaliation." *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994).

Nevertheless, the Society contends that there is no causal link because too much time passed between the protected complaints and the retaliatory firing. Mot. at 19. But given *Carter*, the Fourth Circuit disagrees. And temporal proximity aside, there are other indicia of causality.

"In cases where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri*, 478 F.3d at 650. This is because "intervening events can bridge what would otherwise be a prohibitively long temporal gap." *Holloway v. Md.*, 32 F.4th 293, 300 (4th Cir. 2022).

For example, in *Jalmiran v. Alutiiq Commer. Enter., LLC*, the plaintiff told his employer in May 2019 that he had filed a discrimination complaint with a departmental equal employment office, or EEO. 639 F. Supp. 3d 605, 610 (E.D. Va. 2022). Twenty-five months later, he was terminated. *Id.* Considering the gap, he alleged that his employer participated in the EEO investigation which, in turn, "affected the temporal proximity of [his] termination," with the

obvious inference being that his employer waited to fire him until the EEO investigation had run its course. *Id.* at 611. And that was sufficient to overcome a motion to dismiss. *Id.*

And in *McMillian v. King & Queen Cnty. Sch. Brd.*, the court concluded that "a pattern of antagonism . . . adequately explain[ed]" a 15-month "temporal delay" because the plaintiff alleged that after she made a protected complaint, her supervisor placed her on a PIP and then began ostracizing her, asking coworkers if they had any issues with her, and giving her unfounded reprimands—all before deciding not to renew the plaintiff's contract while she was still on a PIP. *McMillian v. King & Queen Cnty. Sch. Bd.*, 2020 U.S. Dist. LEXIS 169774, at *12-13 (E.D. Va. Sep. 15, 2020).

*Jalmiran* and *McMillian* are remarkably similar to this case. Under *Jalmiran*, the lapse between the 2019 complaint and the retaliation from May 2020 to October 2020 is plausibly explained by the Society's investigation. In response to Mr. Williams's July 2019 complain,  the Society engaged in an internal investigation and an investigation via outside counsel. Compl. ¶ at 25, 42. Those investigations lasted until around April 2020. *Id.* Immediately after the investigations wrapped up, the Society started to disenfranchise Mr. Williams by removing his security access, excluding him from meetings, denying him an office, stripping him of authority to set salaries, and trying to oust him with a bylaw amendment. *Id*. at ¶¶ 47-48, 56, 73. This timeline of complaint to investigation to retaliation mirrors the timeline in *Jalmiran*.

Then, in September 2020, Mr. Williams learned of the "soft approach" memo, that outlined a plan to force Mr. Williams to resign without discussing any performance issues. *Id*. at ¶ 55. And from 2021 to 2022 he was systemically ostracized from meetings. *Id*. at ¶¶ 60-62. But also during that intervening period, he took FMLA leave from July 2022 to August 2022, *id*. at ¶¶ 80, 86, only to return and be immediately met with a PIP, *id*. at ¶ 85.

During the PIP, the Society publicly recruited his replacement. *Id.* at ¶ 101. The Society also learned during the PIP that Mr. Williams was making a record of discrimination and told him to stop *Id.* at ¶ 99. Finally, during or shortly after the PIP, he suffered a heart attack and then, 19 days later, requested FMLA leave, *id.* at ¶ 110. The next day, the Society fired him. *Id.*

Altogether, there are a number of intervening events that explain the temporal gaps between complaints and retaliation—including, the Society's investigations; the "soft approach" memo; the ongoing ostracization; the FMLA leave; the PIP; conduct during the PIP; and the May 2023 absence after the heart attack.

In addition to the intervening events, there is a pattern of discrimination nearly identical to the plaintiff from *McMillian*, where the Society ostracized Mr. Williams from and during meetings and placed Mr. Williams on the pretextual PIP, only to recruit his replacement during the PIP.

The reasonable inference from these events is that the Society slow rolled Mr. Williams's termination as part of its "soft approach" to try and force him out rather than actually terminate him. And when Mr. Williams not only stuck around but, in November 2022, revealed that he was actively cataloguing his complaints. In response, the Society wrapped up the PIP and fired him. These allegations stake out a plausible claim that the Society's termination was retaliation for Mr. Williams's persistent efforts to raise attention to the Society's racism and hostile environment.

## V.    Mr. Williams plausibly alleges that the Society willfully violated the FMLA.

Mr. Williams suffered a heart attack on May 4, 2023. Compl. at ¶ 112. Twelve days later, on May 16, 2023, he verbally requested FMLA leave. *Id.* at ¶ 114. Rather than cooperate, the Society interfered. The Society told Mr. Williams they would "talk about it later" and deferred all discussions about him taking leave. *Id.* Given the Society's non-responsiveness, Mr. Williams

then requested leave in writing on May 22, 2023. *Id*. at ¶ 115. The next day, the Society

terminated him. *Id*. at ¶ 116. By interfering with his leave request and terminating him to avoid

paying his FMLA benefit, the Society violated the FMLA.

These allegations give rise to a timely claim under the FMLA. The FMLA's statute of

limitations begins to accrue from the last violation, and it runs for either two years or, if the

violation was willful, three years. 29 U.S.C. § 2617(c)(1)-(2). Mr. Williams alleges that the

Society acted willfully; therefore, the statute of limitations began on May 22, 2023 and runs

through May 23, 2026.

Willfulness "is generally understood to refer to conduct that is not merely negligent" and

evinces a "reckless disregard" for the fact that one's conduct is prohibited. *McLaughlin v.

Richland Shoe Co.*, 486 U.S. 128, 133 (1988). At the pleading stage, the three-year statute of

limitations applies where plaintiffs have made "a general averment as to willfulness." *Settle v.

S.W. Rodgers, Co., Inc.*, 998 F. Supp. 657, 664 (E.D. Va. 1998), *aff'd* 182 F.3d 909 (4th Cir.

1999). For example, in *Townes v. Md. Dep't of Juvenile Servs.*, the allegation that the employer

"'chose' to take adverse action against her" was sufficient to trigger the three-year statute of

limitations at the pleadings stage. 2015 U.S. Dist. LEXIS 137332, at *16-17 (D. Md. Oct. 8,

2015).

Here, Mr. Williams generally avers that the Society acted willfully. *E.g.,* Compl. at

¶¶ 170, 184, 197, 208, 214. Moreover, the facts alleged infer willfulness. Mr. Williams requested

leave and the Society told him they would discuss it later—only to then fire him after he

requested leave in writing. The Society is no stranger to its FMLA obligations. It granted Mr.

Williams FMLA leave in July 2022. *See id*. at ¶¶ 80, 86. It was therefore well-aware that it was

facing a legitimate FMLA request and, rather than fulfilling its statutory obligations, it brushed

Mr. Williams off in anticipation of its planned retaliatory firing. That is more than mere negligence—that is a reckless disregard for its obligations under the FMLA.

A.      **The suspicious timing of the Society's termination infers causation.**

Like Title VII, FMLA retaliation claims are comprised of a (1) protected activity; (2) adverse action; and (3) a causal link between the two. *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015). The Society challenges only whether the retaliatory firing is causally linked to the protected activity of requesting leave. It contends that the termination cannot be the but-for cause because the Society was planning to fire Mr. Williams before he had a heart attack and needed leave. Mot. at 24.

But the close temporal proximity—which is conspicuously absent from the Society's argument—is itself enough to infer causality. *See Carter*, 33 F.3d at 460 (affirming denial of motion to dismiss and concluding that temporal proximity of six months was "sufficient to establish a *prima facie* case of retaliation"). For example, in *Blankenship v. Buchanan General Hospital*, the employer fired the plaintiff immediately after she took FMLA leave, and that temporal proximity created a fact dispute about the true motivation of the discharge that was sufficient to preclude summary judgment. 140 F. Supp. 2d 668, 674-75 (W.D. Va. 2001) *adopted at* 2001 U.S. Dist. LEXIS 8957.

Moreover, even though Mr. Williams alleges that the Society had a premeditated plan to terminate him, a reasonable inference is that the Society timed the termination to take place in May 2023 so that it could avoid paying for Mr. Williams's FMLA leave.

To be sure, there are cases where Courts—at summary judgment—have determined that an employer's premeditated decision to terminate the plaintiff can undercut an FMLA claim. But in those cases, the employer produced evidence of a nondiscriminatory motive for termination and the employer often made the termination decision "without knowledge of the FMLA

24

request." *Wright v. Sw. Airlines Co.*, 2008 U.S. Dist. LEXIS 66659, at *13 (D. Md. Aug. 21, 2008). In those cases, the employer succeeds because it puts forth evidence that the termination "would have occurred whether or not the employee had requested FMLA leave." *Id.*

The Society offers neither authority nor evidence that could absolve it of liability at the pleadings stage when the facts alleged are that the Society knew about Mr. Williams's heart attack; the Society had received two FMLA leave requests; and, in the face of all that, the Society fired Mr. Williams.

Last, even if the Society is going so far as to argue that the Society's racial animus is a mutually exclusive motivator that precludes an FMLA claim, Mr. Williams is allowed to plead alternative theories of liability. *See* Fed. R. Civ. P. 8(a)(3) ("[A] demand for the relief sought, which may include relief in the alternative or different types of relief."). Only with discovery can Mr. Williams obtain evidence to make a case for the Society's true motives.

> **B.    The Society slow-rolled its response to Mr. Williams's FMLA request to interfere with his benefits.**

FMLA interference involves (i) being entitled to an FMLA benefit; (ii) employer interference with the benefit; and (iii) resulting harm. *Adams*, 789 F.3d at 427. Mr. Williams plausibly alleges every element.

After suffering his heart attack, Mr. Williams verbally requested leave. In response, the Society brushed him off and said that they would talk about it "later." Compl. at ¶ 114.  But "later" never came. On May 22, 2023, Mr. Williams submitted his formal written request for FMLA leave and short-term disability accommodations. *Id.* at ¶ 115. The next day, the Society terminated him. *Id.* at ¶ 116.

This is classic interference. "A plaintiff can state an FMLA interference claim by alleging that a defendant 'terminated [him] interfere with [his] use of FMLA leave, leave [he] would have

been entitled to absent interference by termination.'" *Mickens v. Serco, Inc.*, 2025 U.S. Dist. LEXIS 58523, at *16 (E.D. Va. Mar. 27, 2025). Here, the reasonable inference of Mr. Williams's allegations is that the Society was hoping that it could carry out its retaliatory firing before it was on the hook for Mr. Williams FMLA leave. So rather than respond to Mr. Williams's requests, it brushed him off and then fired him.

In response, the Society appears to dispute whether its refusal to provide Mr. Williams with FMLA paperwork is interference. *See* Mot. at 24-25. That misses the mark. The fact that the Society did not provide Mr. Williams with any FMLA-related paperwork in response to his verbal request is evidence that the Society was never going to honor Mr. Williams's legitimate request for leave. The gravamen of the claim is that the Society interfered with Mr. Williams's FMLA benefits when it brushed off Mr. Williams's verbal request and fired him after the written request.

Next, the Society argues that there was so resulting harm from the interference. But as a direct result of the Society's inference, Mr. Williams never received his FMLA benefits. That is a harm. *See Karnes v. Midland Credit Mgmt.*, 2025 U.S. Dist. LEXIS 55180, at *11 (W.D. Va. Mar. 25, 2025) ("Harm or prejudice exists where an employee . . . loses compensation or benefits 'by reason of the violation.'"). Indeed, that is harm that, on its own, sufficiently alleges element three. *Mickens*, 2025 U.S. Dist. LEXIS 58523, at *16. After the pleadings stage, the Society can wrestle with the extent of the harm and how to assign a dollar value to its actions. But the harm is there.

## VI.    Mr. Williams has plausibly stated a claim for discrimination under the ADA.

"To state a claim for wrongful discharge, the plaintiff must allege that (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise

a reasonable inference of unlawful discrimination." *Kelly v. Town of Abingdon*, 90 F.4th 158, 169 (4th Cir. 2024) (quotation marks omitted).

For the ADA, the familiar 300-day statutory period applies. 42 U.S.C. § 12117 (ADA). Because Mr. Williams's termination took place during the statutory period, his claim is timely.

Mr. Williams's claim is also plausible. Mr. Williams's heart attack constitutes a disability. He alleges that the heart attack and resulting injuries "substantially limit[ed] one or more of the major life activities," 42 U.S.C.S. § 12102(1)(A), in light of the "strict medical restrictions," which included bed rest, urgent medical follow-up, rehabilitation, and "limitations on activities requiring mental alertness" Compl. at ¶ 113. He also alleges that the Society "regarded him" as being impaired, *id.* at § 12102(1)(B), because (i) the CEO reported Mr. Williams as having slurred speech the day before and of the heart attack, Compl. at ¶ 111; and (ii) Mr. Williams told the Society about his severe medical restrictions, *id.* at ¶ 114.

Despite these ailments, Mr. Williams alleges that he was still satisfactorily performing his job. For example, in 2022 he completed and continued to oversee the CAP II Case Management System that allowed the Society to distribute $50 million in assistance, *id.* at ¶ 27(b), and following his termination the CEO called Mr. Williams a "standard-bearer" who left an "indelible mark of commitment and accomplishments" *id.* at ¶ 33.

Nevertheless, the Society fired Mr. Williams less than three weeks after his heart attack. All of this gives rise to a plausible inference that the Society terminated Mr. Williams in response to his disability.

The Society does not dispute elements one through three. Instead, the Society focuses on element four—whether "the circumstances of his discharge raise a reasonable inference of unlawful discrimination." *Kelly*, 90 F.4th at 169. But the only relevant challenge the Society

raises is its repeat argument that it could not have discriminated against Mr. Williams by terminating him because it planned to terminate him before he was disabled. Mot. at 23.

But again, the line of cases that consider a pre-existing decision to terminate an employee also typically involve an employer that did not know about the protected activity or the individual's protected status. *See Wright*, 2008 U.S. Dist. LEXIS 66659, at *13. Moreover, "an 'intervening event' is not a talisman that makes all other evidence of causation disappear, establishing conclusively that there can be no connection between protected activity and an adverse action." *Finley v. Kraft Heinz, Inc.*, 146 F.4th 382, 390 (4th Cir. 2025). Here, the Society had knowledge of Mr. Williams's disability, and it terminated him to avoid its federal obligations to disabled employees. And even if the Society is again arguing that the Society's racial animus is a mutually exclusive motivator from its disability discrimination, Mr. Williams is allowed to plead alternative theories of liability under Rule 8(a)(3). Thus, the Society's arguments fall short of challenging Mr. Williams's well pled, plausible allegations of disability discrimination.

## VII.    Alternatively, the Court should grant Mr. Williams leave to amend.

Leave to amend is freely granted. Fed. R. Civ. P. 15(a)(2). This is especially so here, where the Society challenges only the sufficiency of the factual allegations—rather than raising a legal theory that could bar a claim regardless of the facts alleged. *See id.* (noting that leave to amend should be freely given absent prejudice, bad faith, or futility).

In opposing future amendments, the Society looks to the length of the Complaint and infers that Mr. Williams has no more facts to plead. *See* Mot. at 26. But this is not an appropriate inference or reputable analysis. To the extent that the Court determines that there are factual deficiencies, Mr. Williams should have the opportunity to remedy them.

As for the Society's general aspersions on the length and complexity of the Complaint, *see* Mot. at 4, the Society created a near 30-month period of ongoing discrimination and

retaliation. Now it must face the facts that underlie the chaotic, unlawful environment it fostered. Whatever critiques the Society has about the well-pled allegations of Mr. Williams's lived reality are better directed inward. And if the Court determines that any of the claims require additional factual allegations, it should grant Mr. Williams leave to amend.

## **CONCLUSION**

Despite Mr. Williams's 25-year record of marked accomplishments and superior performance, the Society launched a campaign of racism and systemic disenfranchisement to discriminate and retaliate against the only Black executive in the Society's history.

The Society's behavior was racist, ableist, and in violation of Title VII, VHRA, § 1981, the FMLA, and the ADA. Mr. Williams has pleaded sufficient facts to plausibly allege as much. Accordingly, the Court should deny the Society's Motion, and this case should proceed to discovery.

January 9, 2026                                      Respectfully submitted

Adam S. Nadelhaft, VSB 91717
Rosemary A. Loehr, (*proc hac vice*)
CHARLSON BREDEHOFT
COHEN BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
anadelhaft@cbcblaw.com
rloehr@cbcblaw.com
*Counsel for Plaintiff, Willie Williams*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of January, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Edward Lee Isler, Va. Bar No. 27985
Micah E. Ticatch, Va. Bar No. 83351
John W. H. Harding, Va. Bar No. 87602
ISLER DARE, P.C.
1945 Old Gallows Road. Suite 650 Vienna, Virginia 22182
Phone: (703) 748-2690
Facsimile: (703) 748-2695
Email: eisler@islerdare.com
Email: mticatch@islerdare.com
Email: jharding@islerdare.com

*Counsel for Defendant*
*Navy-Marine Corps Relief Society*

Adam S. Nadelhaft, VSB 91717
CHARLSON BREDEHOFT
COHEN BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
anadelhaft@cbcblaw.com
*Counsel for Plaintiff, Willie Williams*